Carol Rae WRIGHT, Bonnie Lynn Wright, and the Estate of Tina Marie Wright, Deceased, by her Personal Representative, Patricia Wright, Appellants,

v.

Daniel Paul NEWMAN, John Scheall and John Scheall d/b/a Scheall Driveway,

v.

MISSION INSURANCE COMPANY, Garnishee, Appellee.

No. 84–2478.

United States Court of Appeals, Eighth Circuit.

Submitted April 8, 1985.

Decided July 10, 1985.

Matthew W. Placzek, Springfield, Mo., for appellants.

Spencer J. Brown, Kansas City, Mo., for appellee.

Before ROSS and JOHN R. GIBSON, Circuit Judges, and MEREDITH,* District Judge.

PER CURIAM.

This is a garnishment action seeking the proceeds of an excess insurance policy issued by Mission Insurance Company. The

---

\* The HONORABLE JAMES H. MEREDITH, Senior Judge, United States District Court for the Eastern District of Missouri, sitting by designation.

1. The Honorable Ross T. Roberts, Judge of the Western District of Missouri, Southwestern Division.

2. A complete statement of the facts can be found in the District Court's Memorandum, Opinion and Judgment at pages one through twenty-two.

Garnishors, the Wrights, previously obtained a judgment in the amount of $5,775,000.00 against John Scheall, a named insured of Mission's policy. The District Court[1], 598 F.Supp. 1178, applied Colorado law and held that Mission's policy afforded no coverage because: 1) the underlying carriers had not, as required by the Mission Policy, paid or been held liable to pay the limits of liability of their coverage; 2) the underlying carriers had cancelled their polices prior to the loss; and 3) the driver operating the vehicle involved was not covered under either the underlying or the excess coverage.

The relevant facts are as follows.[2] John J. Scheall, d/b/a Scheall Driveway Service, located in Lakewood, Colorado, was a common carrier transporting vehicles for hire to various places in the United States. Under a franchise arrangement with American Auto Shippers he was able to secure limited insurance coverage on a policy written by Commercial Union Insurance Company.[3]

Scheall sought additional insurance and eventually acquired coverage from Guaranty National Insurance Company (primary insurer),[4] Bellefonte Insurance Company (underlying excess liability carrier),[5] and Mission Insurance Company (excess liability carrier).[6] The Guaranty National and Bellefonte applications[7] listed three names under "Driver Information": 1) William Cook; 2) John J. Scheall; and 3) Leonard A. Weaver. Similarly, Endorsement A–800 stated that the company would not be liable for any driver other than the above named. Sayre and Toso (Mission's Managing General Agent) agreed to consider insuring

---

3. The limit on coverage was $300,000 per occurrence for bodily injury and $15,000 per occurrence for property damage.

4. The policy contained a single limit on liability of $300,000 for bodily injury and property damage.

5. Bellefonte's limit was $200,000.

6. Coverage was $3,000,000 excess of underlying insurances.

7. The Guaranty National application served as the Bellefonte application.

Scheall based upon the identities and reputations of the underlying companies (Guaranty National and Bellefonte) and looked to those companies for risk evaluation and claim adjustments.

The Mission Policy was entitled "EXCESS LIABILITY &/OR PROPERTY DAMAGE", and several provisions in the policy addressed its limited role as "excess" carrier. The policy also stated that it was subject to all exclusions in the underlying policies. The above policies were issued in December 1979, effective November 30, 1979.

After the policies were issued, High Country (Managing General Agent for Guaranty National and Bellefonte) received information from the State of Colorado concerning the poor driving records of Scheall and Cook. High Country advised Mooney[8] and Scheall that the Guaranty National and Bellefonte policies would be cancelled effective February 28, 1980. High Country did not notify Mission of the cancellations and the jury specifically found in answer to Question 4 that Sayre and Toso, Mission's agent, did not know of the cancellations before February 28, 1980.

On March 4, 1980 Daniel Paul Newman, driving as a Scheall employee, collided head-on with the Wright vehicle. On March 11, 1980[9] Mission sent notice of cancellation of its policy effective March 21, 1980.

Appellants argue: 1) that Mission Insurance has waived its right to rely upon its requirement of underlying insurance or the terms of underlying policies, since on March 11, 1980, Mission with full knowledge of the underlying policies purported cancellation effective February 28, 1980, chose to keep its policy in force until March 21, 1980 and collect additional premiums; 2) that Mission cannot deny coverage on the ground that either underlying coverage was cancelled or Newman was not a covered driver because under waiver and estoppel theories Mission is limited to the defenses listed in its January 4, 1983 letter stating the policy had been cancelled "flat", regardless of any showing of prejudice; however, prejudice has been shown because John Scheall presented no defense;[10] 3) that Mission's policy was ambiguous concerning the requirement of "underlying insurance", since the portion describing underlying insurance contained the words "not applicable", and condition five requiring maintenance of underlying policies and using the phrase "during the currency of this insurance" created an ambiguity, and any ambiguity should be construed against the drafter; 4) suspension[11] occurs only if the breach was causally related to the loss and in this case no causal link exists, therefore, the requirement of underlying coverage is irrelevant; 5) the driver exclusion endorsement[12] contained in Guaranty National's policy does not de-

---

**8.** Mooney was an independent insurance broker contacted by Cook initially to find insurance coverage for Scheall.

**9.** The jury found that when Mission sent the notice of cancellation, it did know of Guaranty National's and Bellefonte's cancellations.

**10.** Scheall and plaintiffs entered an agreement entitled "Contract Pursuant to Section 537.065 V.A.M.S." in which they agreed: 1) Commercial Union would pay plaintiffs its policy limit of $300,000 and plaintiffs would release Commercial Union from all further liability; 2) plaintiffs would not look to the assets of Scheall to satisfy any judgment; 3) that Scheall would refuse to permit any insurance company to defend on his behalf unless the insurance company admits coverage; 4) that if no insurance company defends under the above conditions, Scheall would take a default judgment; and 5) that Scheall would not communicate with any

insurance company unless plaintiffs' counsel was present.

Appellants claim prejudice was shown because: 1) Scheall waived a jury trial; 2) he did not present any evidence contesting plaintiff's damages; 3) he did not continue to retain legal counsel after learning of Mission's position; and 4) he totally abandoned defense of the lawsuit.

It is clear that any prejudice which resulted, resulted as a consequence of the agreement between plaintiffs and Scheall, and not as a consequence of the actions of Mission.

**11.** The trial court found that Mission's coverage was suspended upon cancellation of the underlying insurance.

**12.** Endorsement No. A–800.

feat coverage since it conflicts with Endorsements A–798 [13] and A–970 [14] and any endorsement denying coverage to Newman would be contrary to the representations of Mooney, and would be contrary to the reasonable expectations of Scheall and Mission,[15] 6) Mission's liability condition does not require that Guaranty National and Bellefonte be parties to the litigation and be held liable to pay their policy limits, since an underlying carrier can be held liable without being a party; and 7) pre-accident cancellations of the underlying policies were invalid because Endorsement No. A–730 prohibits cancellation except for certain enumerated reasons, none of which occurred in the instant case. After careful consideration, this court rejects appellants' arguments.

The relevant parts of Mission's policy are as follows:

> This Insurance to the extent and in the manner hereinafter provided, is to pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay, ..., as damages because of (bodily injury or property damage) caused by an occurrence and arising out of such hazards as are set forth in Item 4 of the Schedule and which are also covered by and defined in the policy/ies specified in the Schedule and issued by the "Primary Insurers" specified therein,
>
> Provided always that: —
>
> (a) Liability attaches to the Underwriters only in respect of such hazards as are set forth in Item 4 of the Schedule and only for such coverages and limits against which an amount is inserted in Item 8(b) or 8(c) of the Schedule and then only after the Primary and Underlying Excess Insurers have paid or been held liable to pay the full amount of their respective ultimate net loss liability as set forth in Item 8(a) and designated the "Primary and Underlying Excess Limits."

### EXCLUSIONS

.    .    .    .    .

4. This insurance is also subject to all the exclusions contained in the policy/ies of the Primary Insurers.

### CONDITIONS

.    .    .    .    .

4. ATTACHMENT OF LIABILITY. Liability to pay under this Insurance shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability for the Primary and Underlying Excess Limit(s) or unless and until the Assured has by final judgment been adjudged to pay an amount which exceeds such Primary and Underlying Excess Limit(s) and then only after the Primary and Underlying Excess Insurers have paid or have been held liable to pay the full amount of the Primary and Underlying Excess Limit(s).

**13.** Endorsement No. A–798 reads in pertinent part:
THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY.
Any auto you don't own while driven with the plates described in this endorsement is a covered auto, but only while auto is driven by you or for you from its distribution point to its destination.

**14.** Endorsement No. A–970 reads in pertinent part:
THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY.
D. WHO IS INSURED.
1. You are an insured for any covered auto.

It is interesting to note that not only do Endorsements A–798 and A–970 contain the caption "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY," but A–800 does also. Considering A–800, A–798 and A–970 together, there appears to be no real ambiguity between the three.

**15.** Appellant relies heavily upon *Sanchez v. Connecticut General Life Insurance Co.,* 681 P.2d 974 (Colo.App.1984), in arguing the applicability of the doctrine of reasonable expectations. However, the language in *Sanchez* suggests that the holding may be limited to similar factual situations where the insured is unaware of the specific contractual provisions. In any case, Scheall had no *reasonable* expectation that this collision would be covered under Mission's policy.

5. MAINTENANCE OF PRIMARY INSURANCE. It is a condition of this Insurance that the policy/ies of the Primary and Underlying Excess Insurers shall be maintained in full effect during the currency of this Insurance except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of occurrences during the policy year.

In respect of the hazards set forth in Item 4 of the Schedule this Insurance is subject to the same warranties, terms, conditions and exclusions (except as regards the premium, the obligation to investigate and defend, the renewal agreement (if any), the amount and limits of liability other than the deductible or self-insurance provision were applicable, AND EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in or as may be added to the policy/ies of the Primary Insurers prior to the happening of an occurrence for which claim is made hereunder and should any alteration be made in the premium for the policy/ies of the Primary Insurers during the currency of this Insurance, then the premium hereon shall be adjusted accordingly.

Under the terms of this policy, Mission's status as an excess carrier is unmistakably clear. The insurance agreement specifically states: 1) the coverage shall be for "excess automobile liability"; 2) liability attaches only after the Primary and Underlying Excess Insurers have paid or been held liable to pay; and 3) that as a condition of this insurance policy, the policies of the Primary and Underlying Excess Insurers must be maintained in full effect. "Where the terms of an insurance contract are plain and unambiguous, the court may not rewrite the contract between the parties, nor limit the effect of the contract as written." *Gulf Insurance v. State*, 43 Colo. App. 360, 607 P.2d 1016, 1018 (1979); *See also Martinez v. Hawkeye Security Insurance Co.*, 195 Colo. 184, 576 P.2d 1017, 1019 (1978) (en banc). Mission's coverage was conditioned upon the maintenance and liability or payment of the primary and underlying excess policies. Both the Guar-

anty National and Bellefonte policies were cancelled prior to the collision and, in any case, did not provide coverage for Newman. Neither company has paid or been held liable to pay for appellants' injuries. This Court will not determine the validity of the cancellations of those policies. Mission, as an excess carrier, cannot be held liable to pay under conditions that its policy clearly states that it will not.

Accordingly, the judgment of the district court is affirmed.