FARMERS & MERCHANTS
INSURANCE COMPANY,
Plaintiff,

v.

MID–CENTURY INSURANCE COMPA-
NY, Bounliem Mahathath, Simmaly
Mahathath, and John Edward Williams,
Jr., Defendants.

No. S 89–0069–C.

United States District Court,
E.D. Missouri,
Southeastern Division.

Nov. 20, 1990.

Albert C. Lowes, Michael H. Maguire, Lowes and Drusch, Cape Girardeau, Mo., for plaintiff.

Jeffrey S. Maguire Thomasson, Dickerson, Gilbert & Cook, Cape Girardeau, Mo., Paul C. Hetterman, Gray & Ritter, P.C., James M. Martin, Martin, Bahn, Malec & Cervantes, St. Louis, Mo., for defendants.

MEMORANDUM

LIMBAUGH, District Judge.

Plaintiff Farmers & Merchants Insurance Company ("Farmers") filed a one count complaint against defendants seeking declaratory judgment on an insurance policy. The Court exercised diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. The parties agreed to sub-

mit this case on briefs. The Court, having considered the pleadings, deposition testimony of witnesses, and documents admitted into evidence hereby makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

## I. *Findings of Fact*

On August 7, 1988 Phounesavath Mahathath ("Phounesavath") was a passenger in a 1974 Ford Ranchero ("Ranchero") driven by John Edward Williams, Jr. ("John Jr.") when the Ranchero left the road and struck the bottom of a hole or embankment. Phounesavath was killed in the accident. Farmers insures Bounliem Mahathath and Simmaly Mahathath, the parents of Phounesavath. The Mahathaths brought a wrongful death claim against Farmers on their uninsured motorist coverage alleging that John Jr. was an uninsured motorist at the time of the accident. Farmers settled the wrongful death claim for $43,000.00. Farmers then brought this action against the Mahathaths, John Jr., and Mid–Century Insurance Company ("Mid–Century") seeking declaratory judgment on the issue of whether John Jr. was an uninsured motorist at the time of the accident.

On March 2, 1988 Mid–Century issued an automobile liability policy No. 14 12290 74 79 ("Policy") in the name of John Edward Williams, Sr. ("John Sr."). John Sr., who is the father of John Jr., listed John Jr. as an additional driver on the declarations page of the Policy. John Jr. was a resident in the household of John Sr. at all times relevant to this action. The Policy provided John Sr. with automobile liability coverage of $25,000 per person, $50,000 per occurrence, and $10,000 property damage. The Policy covered a 1974 Ford Torino ("Torino") registered in the name of John Sr.

The parties submitted to the Court the entire depositions of John Sr., John Jr., Bruce Dale Reed, and David Balsman. Mr. Reed is John Jr.'s uncle and the person from whom the Ranchero was purchased. Mr. Balsman is the insurance agent from whom John Sr. purchased liability coverage for the Torino. John Jr. was driving the Ranchero, not the Torino, at the time of the August 7, 1988 accident. Although the memories of John Sr., John Jr., and Mr. Reed were hazy, the testimony of all three deponents revealed how John Jr. came to be driving the Ranchero at the time of the accident.

John Jr. learned that Mr. Reed owned an automobile, the Ranchero, which he was willing to sell. On or around April 30, 1988 John Jr. visited Mr. Reed at his house in Murphysboro, Illinois. During this visit Mr. Reed agreed to sell the Ranchero to John Jr. In exchange for the Ranchero John Jr. agreed to pay Mr. Reed a small sum of money, approximately $225.00, and perform maintenance work on Mr. Reed's property. On April 30, 1988 John Jr. endorsed the back of the title for the Ranchero. Mr. Reed, however, retained possession of the title and the Ranchero until John Jr. remitted full payment and performed the requisite amount of maintenance work.

On or around July 3, 1988 the Williams family travelled to Murphysboro, Illinois for a two-week vacation. At the end of the two-week vacation, Mr. Reed determined that John Jr. had performed a sufficient amount of maintenance work on his property. John Jr. also paid Mr. Reed approximately $225.00 in cash. John Jr. borrowed the $225.00 from his parents, and intended to pay them back by working on a boat with his father. On or about July 17, 1988 John Jr. drove the Ranchero from Murphysboro, Illinois to the Williams' house in Perryville, Missouri.

After John Jr. gained possession of the Ranchero he took the car to have it inspected. The inspector refused to pass the Ranchero because of numerous problems. In his spare time John Jr. performed repair work on the Ranchero to correct the problems noted by the inspector. On or about August 5, 1988 the Ranchero finally passed inspection. The Ranchero had no license plates on it. On August 6, 1988, after the Ranchero passed inspection, John Jr. visited the License Bureau in order to have the car licensed. There were no license plates on the Ranchero at the time. The clerk at the License Bureau informed John Jr. that he would have to pay a fine of $75.00 in

order to obtain a license. Because John Jr. did not have sufficient funds, he could not have the Ranchero licensed at that time. John Jr. intended to pay the fine and have the Ranchero properly licensed on the next day that the License Bureau was open, which was Monday, August 9, 1988.

On August 7, 1988 John Jr. attended the Seminary Picnic, an annual social event in the Perryville area. Although the Ranchero was not licensed, John Jr. drove it to the Seminary Picnic because the Torino was not running properly. After visiting the Seminary Picnic, John Jr. agreed to give Phounesavath and some other boys a ride home. Phounesavath sat in the open bed of the Ranchero. On the way to Phounesavath's house John Jr. was involved in the accident in which Phounesavath was killed.

The Ranchero could not be driven after the accident. Through his attorney, Kim Moore, John Sr. notified the insurance company of the Ranchero accident on August 31, 1988.

## II. *Conclusions of Law*

■ The issue presented is whether John Jr. was insured under the Policy at the time of the accident. An insured is not covered for use of an automobile not described in the Policy without a provision in the Policy extending coverage to the automobile not described in the Policy. 8 Blashfield, *Automobile Law and Practice* § 320.1 (1987). The Torino is listed as the sole insured vehicle on the declarations page of the Policy. John Jr. was driving the Ranchero at the time of the accident. Therefore, the Court must determine whether the terms of the Policy extend coverage to the Ranchero.

The Policy provides for coverage of a vehicle not listed on the declarations page

if the vehicle qualifies as a replacement vehicle [1], an additional vehicle [2], or a substitute vehicle.[3] To qualify as a replacement vehicle, additional vehicle, or substitute vehicle, the Ranchero must meet the definition of a "private passenger car" or "utility car". The Policy states:

> **Private Passenger Car** means a four wheel land motor vehicle of the private passenger or station wagon type *actually licensed for use upon public highways.*
>
> **Utility car** means a land motor vehicle having at least four wheels *actually licensed for use upon public highways,* with a rated lead capacity of not more than 2,000 pounds, of the pickup, panel or van type.

(emphasis added). Although the Ranchero had passed inspection at the time of the accident, the Ranchero had not been licensed for use upon public highways. John Jr. attempted to have the Ranchero licensed on August 6, 1988, the day before the accident. John Jr. did not have the car licensed because he did not have the funds to pay the $75.00 fine. Unfortunately, John Jr. drove the unlicensed Ranchero on Saturday, August 7, 1988, and was involved in the accident which is the subject of this suit.[4] Therefore, the Ranchero, which was not licensed for use upon public highways, was neither a "private passenger car" or "utility car" under the Policy at the time of the accident.

■ In the absence of a statute, the risks or causes of loss covered by an automobile insurance policy are contractual and must be determined from the terms of the policy. Blashfield, *supra,* § 320.1; *Automobile Club Inter–Insurance Exchange v. Farmers Ins. Co.,* 778 S.W.2d 772, 774

1. The Policy defines replacement vehicle as "The vehicle described in the Declarations of this policy or any **private passenger car** or **utility car** with which you replace it."

2. The Policy defines an additional vehicle as "Any additional **private passenger car** or **utility car** of which you acquire ownership during the policy period."

3. The Policy defines substitute vehicle as "Any **private passenger car, utility car, or utility**

trailer not owned by you or a **family member** while being temporarily used as a substitute for any other vehicle...."

4. At the time of the accident the license plates of the Torino were stored in the glove compartment of the Ranchero. John Jr. had brought the Torino's license plates to the License Bureau because he thought the License Bureau might need them to license the Ranchero.

(Mo.App.1989); *Hempen v. State Farm Mut. Auto. Ins. Co.*, 687 S.W.2d 894, 894 (Mo. banc 1985). The rules of construction applicable to insurance contracts require that the language used be given its plain meaning and if the language is unambiguous the policy must be enforced according to such language. *Briggs v. State Farm Fire and Casualty Co.*, 680 S.W.2d 444 (Mo.App.1984) (*citing Robin v. Blue Cross Hospital Service, Inc.*, 637 S.W.2d 695, 698 (Mo. banc 1982)). Contractual language is ambiguous when doubt or uncertainty exists as to its meaning and it is fairly susceptible of two interpretations. *Automobile Club, supra,* 778 S.W.2d at 774. Ambiguity arises in an insurance policy when it contains duplicity, indistinctiveness, or uncertainty of meaning. *Id.*

■ The term of the Policy which requires "private passenger cars" and "utility cars" to be "actually licensed for use upon public highways" is clear and unambiguous. The Court has no doubt as to its meaning, nor is the term fairly susceptible to two different interpretations, one of which would afford coverage for John Jr. In construing insurance contracts, courts "may never rewrite them so as to provide coverage for which the parties never contracted." *Young v. Ray America, Inc,* 673 S.W.2d 74, 81 (Mo.App.1984) (*quoting Universal Towing Co. v. Hartford Fire Ins. Co.*, 421 F.2d 379, 381 (8th Cir.1970)). If the Court provided coverage for the Ranchero, though it was not licensed for use upon public highways at the time of the accident, the Court would be rewriting the Policy in contravention of its clear and unambiguous terms. Because the Policy does not cover vehicles which are not licensed for use upon the public highways, the Ranchero was not a covered vehicle at the time of the accident.

Although the majority of Missouri courts employ the ambiguous/non-ambiguous test to disputes involving insurance contracts, some Missouri courts have embraced the doctrine of "reasonable expectations" in the construction of insurance contracts. *See Estrin Constr. Co. v. Aetna Casualty & Surety Co.*, 612 S.W.2d 413 (Mo.App.

1981). The doctrine is applied to the non-negotiated portions of insurance contracts which might generally be considered instruments of adhesion. *Wright v. Newman,* 598 F.Supp. 1178, 1205 (W.D.Mo. 1984), *aff'd,* 767 F.2d 460 (8th Cir.1985). The thrust of the doctrine is to set aside the ambiguity/non-ambiguity test for determining the meaning or efficacy of a particular non-negotiated term, and instead to inquire what the "objectively reasonable expectations" of the adhering party might have been on that subject, given the totality of the transaction and the circumstances surrounding it. *Id.* The reasonable expectations doctrine relieves the adhering party to an insurance contract of being bound to unknown terms which are beyond the range of reasonable expectation. *Estrin Construction Co., supra,* 612 S.W.2d at 423.

The term requiring vehicles to be actually licensed is fairly characterized as a non-negotiated term of the Policy. The term, however, cannot be characterized as (1) an unknown term, or (2) beyond the range of reasonable expectation. The Policy, which identifies itself as an "E–Z–Reader Car Policy" is written in clear, plain language directed at the average person rather than those instructed in legal terminology. The term requiring vehicles to be licensed is not buried in a sea of minuscule print but is written in standard size print in the "Definitions" section of the Policy. Furthermore, the term requiring vehicles to be licensed is not beyond the range of reasonable expectations because it is in accordance with state law requiring all vehicles to be properly registered and licensed to be used on public highways. *See* Mo.Rev. Stat. § 301.010 *et seq.*

The parties dispute whether the Ranchero qualifies as a "replacement vehicle" under the Policy. There are questions of fact concerning (1) whether the Torino was inoperable at the time of the accident, (2) whether John Sr. or John Jr. owned the Ranchero, and (3) whether John Sr. gave timely notice to his insurance company of the replacement. The Court, however, need not address these questions of fact because replacement vehicles must satisfy

the definition of "private passenger car" or "utility car". The Policy states:

> We will pay **damages** for which any **insured person** is legally liable because of **bodily injury** to any person and **property damage** arising out of the ownership, maintenance or use of a **private passenger car,** a **utility car,** or a **utility trailer.**

Under the terms of the Policy John Jr. was not using a "private passenger car" or "utility car" at the time of the accident because the Ranchero was not actually licensed for use upon the public highways. The 1974 Ford Ranchero driven by John Jr. at the time of the accident on August 7, 1988 was not covered under the Policy. For the foregoing reasons, the Court enters judgment in favor of defendants and against plaintiff on the merits of plaintiff's complaint.