AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, demandante y recurrente, *v.* LIBROTEX, INC. y OTROS, demandados y recurridos; AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, demandante y recurrida *v.* CONTINENTAL INSURANCE COMPANY *et als.*, demandados y recurrentes.

*Números:* RE-94-309          *Resueltos:* 4 de abril de 1997
RE-94-547

*Vicente Santori Coll*, abogado del recurrente Continental Insurance Company; *Harry R. Nadal Arcelay* y *Fernando J. Fornaris*, de *Cancio, Nadal, Rivera & Díaz*, abogados de la Autoridad de Acueductos y Alcantarillados, recurrida.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

### (En Reconsideración)

Estimamos de rigor reconsiderar la opinión emitida el 31 de julio de 1996 en el caso de epígrafe por estar apoyada en una vertiente jurisprudencial minoritaria y en desuso, que tiene el efecto de desvirtuar la naturaleza y el propósito de las cubiertas en exceso. Nos explicamos.

## I

La controversia del caso de autos surge a raíz de una sentencia del Tribunal Superior, Sala de San Juan, contra la Autoridad de Acueductos y Alcantarillados (la Autoridad), mediante la cual se le condenó a compensar los daños causados ascendentes a $2,407,232. La Autoridad contaba con un seguro primario de la Corporación Insular de Seguros (Corporación Insular), con límite de $2,000,000, y dos (2) cubiertas en exceso. La póliza en exceso de American Guarantee and Liability Insurance Company del consorcio Zurich-American Insurance Group[1] (American) tenía un límite de cubierta de $10,000,000, en exceso de los $2,000,000 cubiertos por la Corporación Insular. La tercera póliza fue expedida por The Continental Insurance Company (Continental) con límite de $8,000,000 en exceso de las otras dos (2) pólizas.

---

[1] A cuya póliza se hace referencia en el Endoso Número Dos (2) de la póliza de The Continental Insurance Company como "Zurich's Policy". Dicho endoso está redactado en el idioma inglés.

La Corporación Insular fue adjudicada insolvente, por lo que la Autoridad instó una acción de sentencia declaratoria a los fines de hacer responsable a American y a Continental por la sentencia emitida en su contra en este caso. El tribunal de instancia concluyó que American no venía obligada a descender de nivel (*drop down*) y convertirse en aseguradora primaria. Sin embargo, aduciendo que el lenguaje empleado en la póliza de Continental se prestaba para más de una interpretación, dictaminó que ésta debía descender de nivel para asumir la cubierta de la Corporación Insular. A tono con lo anterior, concluyó que Continental era responsable de la sentencia hasta la suma de $2,000,000, y que American lo era del exceso, conforme con lo establecido en su póliza.

Ante los recursos presentados por la Autoridad y por Continental, emitimos una opinión y sentencia el 31 de julio de 1996, mediante la cual modificamos la sentencia del tribunal de instancia a los efectos de reconocer la aportación de $150,000 provista por la Asociación de Garantía de Seguros Misceláneos de Puerto Rico para cubrir la insolvencia de la aseguradora primaria. De este modo, confirmamos el descenso de nivel ordenado contra Continental y le responsabilizamos por el exceso de $150,000 hasta la suma de $2,000,000, correspondiéndole a American el pago del sobrante.[2]

Inconforme, Continental solicita la reconsideración de nuestra decisión, petición que acogemos por los fundamentos que elaboramos a continuación.

## II

La médula del presente recurso estriba en determinar cuándo, ante la insolvencia de una aseguradora primaria, debe una aseguradora que provee cubierta en exceso "descender de nivel" y suplir la cubierta de la aseguradora primaria.

---

[2] El suscribiente disintió sin una opinión escrita.

*Como regla general, una aseguradora que provee cubierta en exceso no viene compelida a cubrir a un asegurado en sustitución de una aseguradora primaria declarada insolvente.* Véanse: B.R. Ostrager y T.R. Newman, *Handbook on Insurance Coverage Disputes*, 8va ed., Nueva Jersey, Ed. Aspen Law & Business, 1995, Sec. 13.12; 1 *Couch on Insurance 3d* Sec. 6:1 *et seq.* (1995); D.R. Richmond, *Issues and Problems in "Other Insurance", Multiple Insurance, and Self-Insurance*, 22 Pepp. L. Rev. 1373, 1403 (1995); J.P. Schaller, M.E. Medaglia, R.N. Kelly y A.P. LeBel, *Excess, Surplus Lines and Reinsurance: Recent Developments in Umbrella and Excess Liability Insurance*, 24 Tort & Ins. L.J. 283, 291 (1989). Esta postura es cónsona con la naturaleza de las cubiertas en exceso y la expectativa que tienen los contratantes *al momento de pactar el monto de la prima por tales cubiertas.* Lo anterior se infiere del pago de una prima reducida (en comparación con la pagada por la cubierta primaria), reflejo del riesgo reducido que asume una aseguradora al proveer una cubierta en exceso. Sin embargo, cuando el lenguaje utilizado en las cláusulas de un contrato de seguro adolece de ambigüedad, los tribunales son los llamados a interpretar, *caso a caso*, el conjunto de las cláusulas del contrato con miras a determinar cuáles eran las expectativas de las partes al pactar la cubierta, conscientes de que toda ambigüedad debe ser resuelta a favor del asegurado.

"La interpretación de los contratos y demás actos jurídicos, aunque haya de partir de la expresión contenida en las palabras pronunciadas o escritas, no puede detenerse en el sentido riguroso o gramatical de las mismas, y ha de indagar fundamentalmente la intención de las partes y el espíritu y finalidad que hayan presidido el negocio, infiriéndose de las circunstancias concurrentes y de la total conducta de los interesados, como así viene a sancionarlo el Art. 1.2828 [1234 P.R.], el cual no excluye —como ha advertido esta Sala, entre otras sentencias, en la de 8 abr. 1931— los actos anteriores ni las demás circunstancias que puedan contribuir a la acertada investigación de la voluntad de los otorgantes, siendo indudable que entre esos elementos podrá tener importancia muy relevante la

conexión que el acto o negocio guarde con otros que le hayan servido de antecedente o base legal, siempre que la parte contra la cual se esgrima esta norma interpretativa haya tenido, o debido tener, oportuno conocimiento de ello. (Ss de 20 abr.1944 y 14 ene. 1964.)" [F. Bonet Ramón, *Código Civil comentado*, 2da ed., pág. 1009.] *Banco de la Vivienda v. Pagán Ins. Underwriters*, 111 D.P.R. 1, 7 (1981). Véanse: Art. 11.250 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1125; Arts. 1234, 1237 y 1240 del Código Civil, 31 L.P.R.A. secs. 3472, 3475 y 3478; *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991); *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978); *Carrillo Norat v. Camejo*, 107 D.P.R. 132 (1978); *León Ortiz v. Comisión Industrial*, 101 D.P.R. 781 (1973).

Para propósitos argumentativos, partimos del esquema de las tres (3) categorías establecido por el Tribunal Supremo de Louisiana en *Kelly v. Weil*, 563 So.2d 221 (1990) —y adoptado por este Tribunal en la opinión de marras— el cual agrupa las pólizas de exceso conforme a su lenguaje. Aunque este esquema pueda en apariencia resultar idóneo, no ha sido favorecido por la mayoría de los tribunales que han contemplado este tipo de controversia, debido a que resulta sumamente difícil anticipar los diferentes tipos de lenguaje incorporados a los contratos de seguros, como recientemente descubrió el propio Tribunal Supremo de Louisiana al verse obligado a crear una cuarta categoría. *Louisiana Ins. Guar. v. Interstate Fire*, 630 So. 2d 759 (1994). No obstante, a pesar de que no somos partidarios de este esquema —favorecemos en su lugar la metodología de caso a caso— la división en categorías es suficiente para esbozar el razonamiento que sirve de apoyo a nuestra contención.

■ Acorde con el esquema de las tres (3) categorías, observamos que la primera categoría considera aquellas pólizas que describen su cubierta como *"en exceso de la cubierta cobrable del asegurador primario"*. (Énfasis en el original.) *A.A.A. v. Librotex, Inc.*, 141 D.P.R. 375, 382 (1996). Los tribunales que se han enfrentado a este tipo de lenguaje se encuentran divididos en cuanto a si ante este lenguaje la aseguradora que provee cubierta en exceso

debe descender de nivel. Aquellos que favorecen el descenso postulan que ante la insolvencia de la aseguradora primaria, la cubierta de ésta cesa de ser cobrable y, por consiguiente, la aseguradora en exceso viene compelida a cubrir la reclamación. *Nasello v. Transit Cas. Co.*, 530 So. 2d 1114 (1988). De igual forma, algunos tribunales han hecho extensiva esta interpretación del término "cobrable" (*collectible*) al término "recuperable" (*recoverable*). *Sifers v. General Marine Catering Co.*, 892 F.2d 386 (5to Cir. 1990); *Coca Cola Bottling v. Columbia Cas. Ins.*, 14 Cal. Rptr. 643 (1992); *Lechner v. Scharrer*, 429 N.W.2d 491 (1988); *Donald B. MacNeal, Inc. v. Inter. Fire & Cas.*, 477 N.E.2d 1322 (1985); *Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764 (Cal. 1982).

En cambio, la mayoría de los tribunales sostienen que esta interpretación es contraria a la naturaleza de una cubierta en exceso, confiriéndole gran peso a la expectativa de las partes, *conforme a la prima pagada y al riesgo asumido por la aseguradora.* Véanse: *North Carolina Ins. Guaranty Ass. v. Century Indemnity Co.*, 444 S.E.2d 464 (1994); *Playtex FP, Inc. v. Columbia Cas. Co.*, 622 A.2d 1074 (1992); *Hoffman Const. v. Fred S. James & Co.*, 807 P.2d 808 (Or. 1991), confirmado en 836 P.2d 703 (Or. 1992); *Revco D.S., Inc. v. Government Employees Ins. Co.*, 791 F. Supp. 1254 (N.D. Ohio 1991), confirmado en 984 F.2d 154 (6to Cir. 1992); *S.E. Atl. Cargo Operators v. First State,* 398 S.E.2d 264 (1990); *Rapid City Reg. Hosp. v. S.D. Ins. Guar.*, 436 N.W.2d 565 (1989); *Werner Industries, Inc. v. First State Ins. Co.*, 548 A.2d 188 (1988); *Radiator Specialty Co. v. First State Ins. Co.*, 651 F. Supp. 439 (W.D. N.C. 1987), confirmado en 836 F.2d 193 (4to Cir. 1987); *Golden Isles Hospital, Inc. v. Continental Cas. Co.*, 327 So. 2d 789 (1976).

Aunque originalmente favorecimos la vertiente que postula que ante esta clase de lenguaje la aseguradora en exceso desciende de nivel, entendemos que por no ser relevante al presente caso no es necesario adelantar el criterio, en vista de que la interpretación de un contrato de seguros

*debe ser integral, prescindiendo del análisis aislado de sus cláusulas.* Art. 11.250 del Código de Seguros de Puerto Rico, *supra.*

En lo que respecta a las restantes categorías, la segunda considera las pólizas que describen su cubierta como *"en exceso de los límites de las pólizas descritas en el propio contrato".* (Énfasis en el original.) *A.A.A. v. Librotex, Inc.,* supra, pág. 382. Las pólizas que contienen este lenguaje, como la póliza de American ante nuestra consideración, se encuentran claramente exentas de toda ambigüedad, por lo que los tribunales se han negado a requerir el descenso en estos casos. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471; *González v. Coop. Seguros de Vida de P.R.,* 117 D.P.R. 659 (1986). Además véanse, a modo de ilustración: *Hartford Acc. & Indem. v. Chicago Housing Auth.,* 12 F.3d 92 (7mo Cir. 1993); *Federal Ins. Co. v. Srivastava,* 2 F.3d 98 (5to Cir. 1993); *New Process Baking Co. v. Federal Ins. Co.,* 923 F.2d 62 (7mo Cir. 1991); *Hudson Ins. Co. v. Gelman Sciences, Inc.,* 921 F.2d 92 (7mo Cir. 1990); *Lumar Marine, Inc. v. Insurance Co. of North America,* 910 F.2d 1267 (5to Cir. 1990); *Interco Inc. v. National Sur. Corp.,* 900 F.2d 1264 (8vo Cir. 1990); *Garmany v. Mission Ins. Co.,* 785 F.2d 941 (11mo Cir. 1986); *Wright v. Newman,* 767 F.2d 460 (8vo Cir. 1985); *Molina v. United States Fire Ins. Co.,* 574 F.2d 1176 (4to Cir. 1978); *Taylor Service v. Texas Property & Cas.,* 918 S.W.2d 89 (1996); *Atkinson Dredging Co. v. St. Paul Fire & Marine,* 836 F. Supp. 341 (E.D. Va. 1993); *Vickodil v. Lexington Ins. Co.,* 587 N.E.2d 777 (1992); *J. Kinderman & Sons v. United Nat.,* 593 A.2d 857 (1991), confirmado en 619 A.2d 1058 (1993); *Hendrix v. Fireman's Fund Ins. Co.,* 823 S.W.2d 937 (1991); *Donegal Mut. Ins. Co. v. Long,* 597 A.2d 1124 (1991); *Denny's Inc. v. Chicago Ins. Co.,* 286 Cal. Rptr. 507 (1991); *Alaska Rural Elec. Coop. v. INSCO LTD.,* 785 P.2d 1193 (Alaska 1990); *Zurich-American Ins. Co. v. Mead Reinsurance Corp.,* 161 A.D.2d 403 (N.Y. 1990); *American Hoist v. Employers' of Wausau,* 454 N.W.2d 462 (1990); *Alabama Ins. Guar. Ass'n v. Kinder-Care,* 551 So. 2d 286 (1989); *Central Waste Systems v.*

*Granite State*, 437 N.W.2d 496 (1989); *Maricopa County v. Federal Ins. Co.*, 757 P.2d 112 (Ariz. App. 1988); *Highlands Ins. Co. v. Gerber Prods. Co.*, 702 F. Supp. 109 (D. Md. 1988); *Seaway Port Authority v. Midland Ins.*, 430 N.W.2d 242 (1988); *America Re-Ins. v. SGB Univ. Builders*, 532 N.Y.S.2d 712 (1988); *Lamb Bros. Lumber v. South Carolina Ins. Co.*, 366 S.E.2d 388 (1988).

De otra parte, la tercera categoría considera las pólizas que describen su cubierta como *"en exceso de la cantidad mayor entre la cubierta ofrecida por las pólizas listadas en el propio contrato y cualquier otra cubierta cobrable por el asegurado"*. (Énfasis en el original.) *A.A.A. v. Librotex, Inc.*, supra, pág. 383. Este es el lenguaje utilizado en la póliza de Continental y, por lo tanto, la médula de la controversia recae en el alcance interpretativo que se le reconozca a este tipo de lenguaje, conforme al desarrollo jurisprudencial relativo a la doctrina del descenso.

A simple vista, *nos podemos percatar de que el lenguaje considerado en esta categoría es prácticamente idéntico al considerado en la segunda categoría, donde no aplica el descenso.* La diferencia estriba en la añadidura de la frase "y cualquier otra cubierta cobrable por el asegurado", cuyo único efecto es el de beneficiar a la aseguradora que provee la cubierta en exceso en el caso de que surja otra cubierta no listada en su póliza *de la cual no haya tenido conocimiento tal aseguradora,* por lo que dicha frase o coletilla no es aplicable a las pólizas listadas en la póliza de ésta.

No obstante, resolvimos que la frase " 'cobrable por el asegurado' cualifica tanto a 'las pólizas listadas en el propio contrato' como a 'cualquier otra cubierta' ", y conforme al razonamiento adoptado en la consideración del lenguaje típico de la primera categoría expresamos que cuando se utiliza este tipo de lenguaje *"[s]e ha resuelto que aquí aplica el descenso".* (Énfasis suplido y en el original.) *A.A.A. v. Librotex, Inc.*, supra, pág. 383. De esta forma, una mayoría del Tribunal concluyó que Continental venía obligada a descender de nivel y cubrir la partida de $2,000,000

que le correspondía a la aseguradora primaria insolvente, salvo la suma de $150,000 que provee la Asociación de Garantía de Seguros Misceláneos de Puerto Rico para cubrir la insolvencia de la aseguradora primaria.

Esta postura, respecto al lenguaje perteneciente a la tercera categoría, ha sido asumida *únicamente* por tres (3) tribunales estatales. *Alabama Ins. Guar. v. Magic City Trucking*, 547 So. 2d 849 (1989); *Poirrier v. Cajun Insulation, Inc.*, 501 So. 2d 800 (1987); *Geerdes v. St. Paul Fire and Marine Ins. Co.*, 341 N.W.2d 195 (1983). En estos casos se apoyó la mayoría de este Tribunal para llegar a la conclusión antes mencionada. No obstante, el Tribunal Supremo de Louisiana revocó expresamente el precedente de *Poirrier v. Cajun Insulation, Inc.*, supra, en *Kelly v. Weil*, 563 So. 2d 221, 226 (1990), caso que sirvió de modelo a este Tribunal para el de marras con el fin de adoptar el esquema de las tres (3) categorías. El otro caso citado en apoyo de esta postura, *Robichaux v. Randolph*, 563 So. 2d 226 (1990), resuelto el mismo día y por el mismo tribunal que emitió la opinión de *Kelly v. Weil*, supra, es también adverso a tal postura. Por el contrario, la inmensa mayoría de los tribunales estatales y federales ha resuelto, al interpretar semejante lenguaje, que no procede el descenso. *Transco Exploration Co. v. Pacific Employers Ins. Co.*, 869 F.2d 862 (5to Cir. 1989); *U.S. Fire Ins. Co. v. Charter Financial Group*, 851 F.2d 957 (7mo Cir. 1988); *Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122 (7mo Cir. 1987); *Fred Weber, Inc. v. Granite State Ins.*, 829 S.W.2d 589 (Mo. Ct. App. 1992); *Newton v. U.S. Fire Ins. Co.*, 391 S.E.2d (1990); *Kelly v. Weil, supra; Southeast Atlantic Cargo Operator v. First State Ins. Co.*, 398 S.E.2d 264 (1990); *Robichaux v. Randolph*, supra; *Ambassador Associates v. Corcoran*, 541 N.Y.S.2d 715 (1989), confirmado en 562 N.Y.S.2d 507 (1990), confirmado en 581 N.Y.S.2d 276 (1992); *Federal Ins. Co. v. Pacific Sheet Metal*, 774 P.2d 538 (Wash. 1989); *Ware v. Carrom Health Care Products, Inc.*, 727 F. Supp. 300 (N.D. Miss. 1989); *U.S. Fire Ins. Co. v. Coleman*, 754

S.W.2d 941 (1988); *Highlands Ins. Co. v. Gerber Products Co.*, supra; *Radiator Specialty Co. v. First State Ins. Co.*, 651 F. Supp. 439 (W.D. N.C. 1987), confirmado en 836 F.2d 193 (4to Cir. 1987); *United States Fire Ins. Co. v. Capital Ford Truck Sales, Inc.*, 355 S.E.2d 428 (1987); *Pergament Distributors v. Old Republic Ins.*, 513 N.Y.S.2d 467 (1987); *Value City, Inc. v. Integrity Ins. Co.*, 508 N.E.2d 184 (1986); *Guar. Nat. Ins. Co. v. Bayside Resort, Inc.*, 635 F. Supp. 1456 (D. Vi. 1986). Véanse, además: 16 *Couch on Insurance 2d* Sec. 62:119 (Sup. dic. 1995); Schaller y otros, *supra*, pág. 293.

También, otros tribunales han considerado el alcance de la referida coletilla —"otra cubierta cobrable por el asegurado"— cuando aparece en una cláusula independiente titulada "Otras Cubiertas". *En estos casos se ha resuelto que la inclusión de esta cláusula claramente tiene el efecto legal de beneficiar a la aseguradora en caso de que concurran otras pólizas no consideradas en el contrato. Mission Nat. Ins. Co. v. Duke Transp. Co., Inc.*, 792 F.2d 550 (5to Cir. 1986); *Garcia v. Rivera*, 879 F. Supp. 170 (D. P.R.1995); *Domingue v. Reliance Ins. Co.*, 619 So. 2d 1220 (1993); *Hoffman Const. v. Fred S. James & Co.*, supra; *Emscor, Inc. v. Alliance Ins. Group*, 804 S.W.2d 195 (Tex. App. 1991); *Alaska Rural Elec. Co-op. v. INSCO LTD.*, supra; *Highlands Ins. Co. v. Gerber Prods. Co.*, supra; *TXO Production Corp. v. Twin City Fire Ins. Co.*, 685 F. Supp. 156 (E.D. Tex. 1988); *Wurth v. Ideal Mut. Ins. Co.*, 518 N.E.2d 607 (1987); *Holland v. Stanley Scrubbing Well Service*, 666 F. Supp. 898 (W.D. La. 1987); *Radar v. Duke Transp. Inc.*, 492 So. 2d 532 (1986). Véase, además, Richmond, *supra*, pág. 1407.

## III

Aparte del error en que incurrimos inicialmente al adoptar la doctrina relativa a la tercera categoría, basándonos en una vertiente minoritaria y claramente en des-

uso, también se incidió al adoptar tres (3) premisas reñidas con el derecho aplicable.

En primer término, creamos una presunción que no encuentra fundamento en derecho al expresar que "[c]*uando se guarda silencio sobre qué ocurrirá* si el asegurador primario adviene insolvente, se entiende que el asegurado *crea una expectativa* de que la cubierta en exceso le cubrirá". (Énfasis en el original.) *A.A.A. v. Librotex, Inc.*, supra, pág. 383. Es decir, establecimos una presunción de descenso cuando la póliza no incluye una cláusula que considere la insolvencia de la aseguradora primaria.

■    Al sentar esta norma obviamos el hecho de que rara vez existe ambigüedad sobre la expectativa de las partes cuando una póliza en exceso cuenta con una cláusula que considere la insolvencia de la aseguradora primaria.

De igual modo, esta presunción de descenso, o "expectativa" de cubierta en casos de insolvencia, no se deriva ni es cónsona con lo resuelto por la abrumadora mayoría de los tribunales en los casos ya citados, al efecto de que como regla general no se aplica el descenso a pesar de que las pólizas bajo consideración en tales casos nada expresaban respecto a la insolvencia de las aseguradoras primarias.

Consecuentes con este razonamiento, varios tribunales han resuelto *expresamente* que no se crea presunción o expectativa alguna por el hecho de no incluir una cláusula que considere la insolvencia de la aseguradora primaria. *Playtex FP, Inc. v. Columbia Cas. Co.*, supra; *Fred Weber, Inc. v. Granite State Ins.*, supra; *Highlands Ins. Co. v. Gerber Products Co.*, supra. Incluso en *Playtex FP, Inc. v. Columbia Cas. Co.*, supra, el Tribunal Superior de Delaware impuso la norma contraria, al expresar que no procede el descenso *a menos que éste se haya pactado expresamente en el contrato* en vista de que las pólizas en exceso proveen una cubierta por la responsabilidad del asegurado y no por la solvencia de las otras aseguradoras. Conforme con los fundamentos esbozados anteriormente, consideramos que nos equivocamos al inferir una expectativa de descenso en

la póliza de Continental por el mero hecho de que nada se expresó en la misma respecto a la insolvencia de la aseguradora primaria.

█ En segundo término, *incidimos al restarle importancia a la prima pagada por la póliza,* poniendo todo el peso en la interpretación del lenguaje del contrato. Aunque ciertamente el lenguaje es esencial, la prima también es un factor determinante al momento de examinar la expectativa de los contratantes, ya que por lo general ésta es proporcional al riesgo que asume la aseguradora. *Interco Inc. v. National Sur. Corp.,* supra, pág. 1268; *Zurich Ins. Co. v. Heil Co.,* supra, pág. 1126; *Steve D. Thompson Trucking v. Twin City Fire Ins.,* 832 F.2d 309, 310 (5to Cir. 1987); *Revco D.S., Inc. v. Government Employees Ins. Co.,* 791 F. Supp. 1254, 1264 (N.D. Ohio 1991); *Alaska Rural Elec. Co-op. v. INSCO LTD.,* supra, pág. 1195; *Maricopa County v. Federal Ins. Co.,* 757 P.2d 112, 114 (Ariz. 1988); *Radiator Specialty Co. v. First State Ins. Co.,* supra, pág. 442; *Wurth v. Ideal Mut. Ins. Co.,* supra, pág. 610; *Prince Carpentry v. Cosmopolitan Mut. Ins.,* 479 N.Y.S.2d 284 (1984). Véase, además, Richmond, *supra,* págs. 1406–1407.

En el caso de marras observamos que la Autoridad ostentaba tres (3) pólizas para cubrir su responsabilidad —una (1) primaria y dos (2) en exceso de la primaria— las cuales desglosamos a continuación con expresión de sus respectivas cubiertas y primas:

| *Póliza* | *Cubierta* | *Prima* |
|---|---|---|
| * Corporación Insular de Seguros | $0 a $2,000,000 | $2,170,000 |
| * American Guarantee and Liability Ins. Co. | $2,000,000.01 a $12,000,000 | $775,000 |
| * Continental Ins. Co. | $12,000,000.01 a $20,000,000 | $267,000 |

De esta simple tabla se desprende que la prima pagada por cada cubierta *es proporcional al riesgo asumido por cada aseguradora*. No resulta irrazonable inferir o sostener, según se desprende de la prima pagada a Continental,[3] que la expectativa de la Autoridad al pactar el contrato era que Continental cubriría su responsabilidad *sólo de exceder los doce millones de dólares* . Lo que sí resulta irrazonable y, más que ello, *injusto*, es inferir o sostener que la Autoridad, asegurada en este caso, pagó una prima casi *tres veces mayor* a American que la prima pagada a Continental, cuya póliza cubría el exceso de la cubierta de American, con la intención de que fuera Continental la que respondiera en caso de que la cubierta primaria no pudiera cobrarse.

En tercer lugar, no podemos olvidar que en nuestra función interpretativa del alcance de un contrato debemos analizar integralmente todas sus cláusulas, prestando especial atención a los *endosos*. Sobre este particular dispone el Art. 11.250 del Código de Seguros de Puerto Rico, *supra*, que todo contrato de seguro deberá interpretarse globalmente y a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y *según se hayan ampliado, extendido o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta*.

La singular importancia de los endosos recae en que estos reflejan *la última expresión de las partes* y que, con marcada frecuencia, sirven de enmienda *o nota aclaratoria de alguna cláusula del contrato*. A tales efectos, resulta ilustrativa la siguiente expresión del Tribunal de Apelaciones de Michigan en *Morback Industries v. Western Emp. Ins.*, 429 N.W.2d 213, 218 (Mich. App. 1988): "La re-

---

[3] Dicha prima representa poco más de *una tercera parte* (34.45%) de la prima pagada a la aseguradora del segundo nivel (American Guarantee and Liability Insurance Company) y *una octava parte* (12.3%) de la prima pagada a la aseguradora primaria (Corporación Insular de Seguros).

gla general, en Michigan como en otros lugares, es que, de haber una ambigüedad de tal modo que no se puedan armonizar todas las partes de un contrato, *el lenguaje del endoso o cláusula adicional es el que rige.*" (Traducción y énfasis nuestros.)

Al aplicar esta regla interpretativa al caso ante nuestra consideración, notamos que el endoso número dos (2) del contrato de Continental claramente y sin ambages *establece que la cubierta es en exceso de, y conforme con, los términos y las condiciones de la póliza de American*[4], la cual, según resolvimos, no da lugar al descenso. En nuestra decisión original inadvertidamente restamos valor a este endoso al pasar por alto que constituye la última expresión de la voluntad de las partes.

Aún si reiterásemos la postura asumida inicialmente por este Tribunal y por los tribunales de Alabama y Michigan, donde se tilda de ambiguo el lenguaje correspondiente a la tercera categoría, *el endoso número dos (2) de la póliza de Continental ineludiblemente sirve de nota aclaratoria y nos libra de toda duda en la interpretación de la referida póliza, quedando vedado el descenso de nivel ante la insolvencia de la aseguradora primaria.*

## IV

A pesar del efecto lamentable que pueda tener la insolvencia de la Corporación Insular sobre su asegurada la Autoridad, ni el derecho aplicable ni la política pública sirven de justificación para imponerle a Continental una responsabilidad exógena a la cubierta pactada entre las partes.

Sostener nuestro dictamen tendría el efecto de desvirtuar la naturaleza de las cubiertas en exceso y convertir a las compañías que expiden esas pólizas en aseguradoras de

---

[4] Dicho endoso, redactado en el idioma inglés al igual que el resto de la póliza, dispone del modo siguiente:

"It is agreed and understood that coverage as afforded under this policy is excess of and following the terms and conditions of Zurich's [American] Policy FXS 608351700 unless as otherwise amended by this policy." Apéndice, pág. 39.

la insolvencia de otras compañías, *riesgo que no está considerado ni se refleja en el pago de la prima.*

En consecuencia, estimamos procedente reconsiderar nuestra decisión y, en cambio, resolver que American y Continental no vienen obligadas a descender de nivel y a cubrir la insolvencia de la aseguradora primaria. En vista de ello, corresponderá a la Asociación de Garantía de Seguros Misceláneos de Puerto Rico, como aseguradora de la insolvencia de la Corporación Insular, responder por la suma de $150,000, y a American en el exceso de los $2,000,000.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García emitió una opinión disidente. Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri disintieron sin opiniones escritas.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

(En reconsideración)

I

El 31 de julio de 1996 resolvimos,[1] por vez primera, que ante la insolvencia de un asegurador primario los aseguradores en exceso descenderán de nivel y responderán por la totalidad de aquellas reclamaciones existentes antes de la determinación de insolvencia, *de acuerdo con el lenguaje del contrato de seguro.* Nuestra razón de decidir (*ratio decidendi*) fue cónsona con la doctrina jurisprudencial y con las reglas de hermenéutica que, por considerar los con-

---

[1] La opinión original recibió la conformidad de cinco (5) Jueces Asociados de este Tribunal, Señora Naveira de Rodón y Señores Rebollo López, Fuster Berlingeri, Corrada Del Río y el que suscribe. El Juez Presidente Señor Andréu García disintió sin una opinión escrita. El Juez Asociado Señor Hernández Denton no intervino originalmente.

tratos de seguro como unos contratos de adhesión, *favorecen una interpretación liberal en favor del asegurado y el sostener la cubierta cuando existe ambigüedad en su lenguaje. González v. Coop. Seguros de Vida de P.R.*, 117 D.P.R. 659, 663 (1986); *Banco de la Vivienda v. Pagán Ins. Underwriters*, 111 D.P.R. 1, 6 (1981); *Casanova v. P.R.-Amer. Ins. Co.*, 106 D.P.R. 689, 696 (1978).

## II

Distinto del respetable criterio mayoritario, denegaríamos la reconsideración. La opinión del Tribunal tiene un efecto perjudicial sobre el asegurado al evitar que un asegurador en exceso descienda de nivel y se convierta en primario, aun cuando el lenguaje utilizado en la póliza razonablemente permita una interpretación distinta. Así se establece jurisprudencialmente, como regla general, que un asegurador no descenderá de nivel ni sustituirá al asegurador primario, aun cuando omita pactar expresamente esta limitación en el contrato de seguro. Por considerar que semejante razonamiento es lesivo a los intereses de aquel asegurado que por razones externas ha quedado descubierto, disentimos.

En nuestro razonamiento original adoptamos *Kelly v. Weil*, 563 So. 2d 221 (La. 1990), a los *únicos efectos* de establecer las tres (3) categorías en que la jurisprudencia anglosajona ha dividido las pólizas de seguro, según el lenguaje utilizado en ellas.

En la opinión original no cuestionamos, y así lo *reconocimos*, que en cuanto a la primera y tercera categoría, unos casos concluyen que aplica la doctrina del descenso y otros que no. Por esa razón, al decidir que en la primera categoría aplica la mencionada doctrina y que el asegurador en exceso responde por la totalidad de la reclamación, expusimos en el escolio núm. 8 lo siguiente:

"Para casos en que se haya determinado que no aplica la

*doctrina del descenso*, aun bajo cláusulas que utilicen el término *cobrable*, véase 85 A.L.R.4th 748 (1991)." (Énfasis en el original.) *A.A.A. v. Librotex, Inc.*, 141 D.P.R. 375, 382 esc. 8 (1996).

Al reexaminar ahora la cuestión, advertimos que las pólizas *bajo la tercera categoría utilizan también la palabra "cobrable"*. Al analizar esta categoría concluimos, entonces, que "bajo igual razonamiento que en la primera categoría, se sostiene la cubierta del asegurador en exceso". *A.A.A. v. Librotex, Inc.*, supra, pág. 383. *Por lo tanto, de la misma manera que para la primera categoría, los casos aludidos en el escolio Núm. 8 ilustran una postura contraria a la que adoptamos.*

Ciertamente, incorporamos las categorías mencionadas en *Kelly v. Weill*, supra, sobre la inaplicabilidad de la doctrina del descenso bajo la tercera categoría, *no su dictamen. Por el contrario*, adoptamos la tesis *minoritaria* y sostuvimos la cubierta. Al así hacerlo, tomamos en consideración nuestra postura jurisprudencial, recientemente reiterada en *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 154–155 (1996), a los efectos de que:

> No debemos ... perder de vista el hecho de que en caso de dudas en la interpretación de una póliza, ésta debe resolverse de modo que se realice el propósito de la misma: *proveer protección al asegurado. Es por eso que no se favorecerán las interpretaciones sutiles que le permitan a las compañías aseguradoras evadir su responsabilidad.* Corresponde a los tribunales buscar el sentido y significado que a las palabras de la póliza en controversia le daría una persona normal de inteligencia promedio que fuese a comprar la misma. No debe atenderse demasiado al rigor gramatical, sino al uso general popular de las voces, de manera que los contratos de seguro sean entendidos e interpretados en su más corriente y usual significado.
>
> Como regla general, los contratos de seguro, por ser considerados de adhesión, *se interpretan liberalmente a favor del asegurado.* (Citas y escolios omitidos y énfasis suplido.)

Reiteramos ese enfoque hermenéutico, como vehículo de aproximación a la mayor protección del asegurado, cónsono con nuestra casuística.

En un uso excesivo de rigor gramatical, la opinión mayoritaria coincide con nuestros pronunciamientos originales, y resuelve que del lenguaje utilizado en la póliza de American Guarantee and Liability Insurance Co. surgía que era en exceso, activándose sólo después de que la Corporación Insular de Seguros hubiese pagado. Sin embargo, al examinar el lenguaje utilizado en la póliza de Continental Insurance Co., éste se aparta de la interpretación exclusivamente gramatical. Concluye que no venía obligada a descender de nivel y proveer la cubierta. Veamos.

Bajo el acápite "Condiciones", en el inciso (3), titulado *Límites de Responsabilidad*, la póliza entre Continental Insurance Co. y la Autoridad de Acueductos y Alcantarillados estableció que *"con respecto a la cubierta (A), (B) o (C) o cualquier combinación de éstas, la compañía responderá sólo en exceso de: (a) los límites de responsabilidad de los seguros subyacentes descritos y listados en la propia póliza y de cualquier otro seguro subyacente cobrable por el asegurado ..."*. (Traducción y énfasis nuestros.) Apéndice, pág. 176. El lenguaje de ésta cláusula corresponde al de los contratos de la tercera categoría. El término *cobrable* cualifica tanto la expresión *"límites de responsabilidad de los seguros subyacentes descritos y listados en la propia póliza"* como también *"cualquier otro seguro subyacente"*. Debido a que la cubierta provista por la Corporación Insular de Seguros no es cobrable, *aplica la doctrina del descenso.*

De otra parte, el argumento de la opinión mayoritaria se basa en que resulta irrazonable que un asegurador en exceso —Continental Insurance Co.— que comparativamente cobró menos cantidad por su póliza, sustituya al asegurador primario —Corporación Insular de Seguros— quien de ordinario cobra una cantidad sustancialmente mayor por su póliza debido a que el riesgo asumido por la aseguradora aumenta. No obstante, el que la prima cobrada por Continental Insurance Co. fuera la menor —en contraste de la Corporación Insular de Seguros y American Guarantee and Liability Insurance Co.— no altera nuestra

interpretación inicial de que, conforme al lenguaje utilizado en la propia póliza, estaba obligada a descender de nivel y sustituir a la Corporación Insular de Seguros como asegurador primario.

Finalmente, recordamos que "[e]l Derecho no se nutre de postulados absolutos y sí de ecuaciones que reconocen un equilibrio de factores y fuerzas contradictorias que conjugadas resultan en una adjudicación de fundamental justicia". *Morales Garay v. Roldán Coss*, 110 D.P.R. 701, 705 (1981). Denegaríamos la reconsideración.