En el Tribunal Supremo de Puerto Rico

| Robert W. Stokes y Elena Abréu, por si y por su sociedad legal de gananciales Demandantes-recurridos | Certiorari |
|---|---|
| .V | TSPR98-49 |
| Reynés Serrano Lecaroz y otros Demandados-recurridos | |

Número del Caso: CE-91-762

Abogados Parte Tercera demandada-peticionaria: Lic. Jorge A. Pierluisi, Jr.
Lic. Efrén T. Irizarry Colón

Abogados Parte Demandada=recurrida: Lic. Manuel Martínez Umpierre
Lic. Juan E. Taboas Santiago
Lic. Elías Dávila Beeríos
Lic. Plácido Berio Ramos
Lic. José R. Capó
Lic. Mario Torres

Abogados Parte Interventora-recurrida F.S.E.: Lic. Ulises Ortiz Rodríguez

Tribunal de Instancia: Superior, Sala de Arecibo

Juez del Tribunal de Primera Instancia: Hon. Concepción Del Pilar Igartúa

Tribunal de circuito de Apelaciones:

Juez Ponente:

Fecha: 4/24/1998

Materia:

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

Robert W. Stokes y Elena Abreu,
por sí y por su sociedad legal
de gananciales

    Demandantes-Recurridos

    v.                           Caso Núm. CE-91-762

Reynés Serrano Lecaroz, Néstor
Serrano Colón, María Josefa Lecaroz,    Sobre:
Club Náutico de Arecibo

                                     Certiorari

    Demandados-Recurridos

----------------------------------------

Néstor Serrano Colón y María Josefa
Lecaroz Guzmán, por sí y como padres
con patria potestad del menor Reynés
Serrano Lecaroz

    Demandantes-Recurridos

        v.

Robert Stokes y Elena Abreu, ambos
por sí y como miembros de la sociedad
legal de gananciales por ellos
constituida, la Corporación Concrete,
Club Náutico de Arecibo, Inc.

    Demandados-Recurridos

        v.

Jorge Marquez Gómez, en su carácter
de Administrador Interino del Fondo
del Seguro del Estado

    Interventor-Recurrido

        v.

Albany Insurance Co.

    Tercera Demandada-Recurrente

----------------------------------------

Opinión del Tribunal emitida por el Juez Presidente señor Juez Andréu García

San Juan, Puerto Rico, a 24 de abril de 1998

    Debemos resolver si la cubierta de una póliza de Seguro

Comprensivo de Responsabilidad General (en adelante "SCRG") que emitió Albany Insurance Company (en adelante "Albany") a favor del Club Náutico de Arecibo (en adelante "Club") cubre los daños reclamados en este caso.

I

Los hechos pertinentes a la controversia planteada surgieron con relación a un incendio ocurrido el 17 de noviembre de 1986 en una lancha propiedad de los co-demandados Robert Stokes y Elena Abreu. Se alega que la lancha se incendió mientras estaba amarrada en el muelle del Club, supuestamente por la negligencia de unos empleados del Club y de un empleado de los señores co-demandados. Como consecuencia del incendio, se presentaron varias reclamaciones ante el antiguo Tribunal Superior, Sala de Arecibo, incluyendo una demanda contra tercero presentada por el Sr. Stokes y la Sra. Abreu contra Albany. En esta demanda se alegó que al momento de los hechos Albany tenía expedida a favor del Club la póliza de responsabilidad pública SMP 561545, por lo que está obligada a responderle a los terceros-demandantes o a los demandantes directamente por aquellos daños imputables a su asegurado.

En su contestación a la demanda contra tercero, Albany admitió haber expedido la póliza SMP 561545. Sin embargo, negó que la misma cubriera los daños surgidos de las operaciones marítimas del Club. En primer lugar, opuso que además del muelle, las facilidades del Club también incluyen una "Casa Club", un estacionamiento y una cancha de baloncesto y que al designar las facilidades cubiertas por la póliza no se incluyó el área del muelle o la marina. En segundo lugar, argumentó que del lenguaje utilizado al clasificar la póliza se desprende que la misma estaba limitada a las actividades típicas de un club de tipo "country club", de tenis, de polo o de golf, por lo que tal póliza no se hizo extensiva a la operación de la marina.

Ante esta controversia, las partes en el pleito presentaron una moción conjunta solicitándole al tribunal de instancia una determinación preliminar para resolver el asunto de la cubierta. El tribunal acogió la petición y, tras la celebración de vistas al efecto, resolvió que la

cubierta incluye todas las reclamaciones que son objetos de este pleito. Inconforme, acudió ante nosotros Albany, solicitándonos que revoquemos la resolución emitida y en su lugar desestimemos la demanda presentada en su contra. Su argumento principal es que, independientemente del texto de la póliza, de las circunstancias que precedieron su contratación y por el monto de la prima pactada, se desprende que la intención de las partes no fue asegurar los daños que pudieran surgir de las operaciones marítimas del Club, sino únicamente las operaciones sociales y recreativas.

Estando en condiciones de resolver, procedemos a así hacerlo.

II

La póliza emitida por Albany a favor del Club es una póliza llamada "Special Multi-Peril Policy" (en adelante "SMP") que generalmente comprende cuatro (4) tipos de cubierta. La primera es una cubierta para la propiedad del asegurado, la segunda para responsabilidad pública, la tercera para actos criminales y la cuarta para maquinaria y calderas. La que nos interesa a nosotros es la segunda.

La cubierta de responsabilidad pública contenida en la póliza que expidió Albany a favor del Club es una cubierta de SCRG que sigue la estructura conocida como "a todo riesgo" y que emplea el lenguaje y el formato adoptado como "póliza modelo" por la industria de seguros. La misma contiene una cláusula que la industria denomina "acuerdo general de cubierta" y que dispone como sigue:

> La compañía aseguradora pagará por parte del asegurado toda suma de dinero que el asegurado esté legalmente obligado a pagar por:
>
> A. daños físicos o
> B daños a la propiedad
>
> **a los que el seguro aplique**... Póliza, formulario L 6394a, Petición de Certiorari a la pág. 188. (Enfasis suplido.)

Inmediatamente después de este acuerdo, la póliza enumera diecisiete (17) cláusulas de exclusión de responsabilidad que limitan la obligación de la aseguradora, de modo que responderá por todos los daños causados por su asegurado a menos que estén expresamente excluidos.[1]

---

[1] Véase Appleman, Insurance Law & Practice, § 4491.0.

Como señalamos en <u>Meléndez Piñero</u> v. <u>Levitt & Sons</u>, opinión del 13 de diciembre de 1991, 91 JTS 95:

> En este tipo de póliza el asegurador establece la cobertura de la póliza o seguro expedido mediante una cláusula, notoriamente amplia, denominada "acuerdo general de cubierta" (coverage of insurance agreement). [...] A renglón seguido sin embargo, el asegurador limita el ámbito de su obligación... al proveer que "este seguro no aplica" a alrededor de diecisiete (17) exclusiones de responsabilidad... De modo que los riesgos que no se excluyen formalmente... quedan incluidos como parte de la garantía del seguro. [...] Como puede suponerse, en la práctica no existe un seguro que cobije toda la responsabilidad en que puede incurrir una persona. Lo que existe son seguros de responsabilidad civil que cubren determinadas actividades del asegurado, capaces de producir daños." Id a la pág. 9052.

Es por razón de este último punto que cobra importancia la frase **"a los que el seguro aplique"** contenida en el acuerdo general de cubierta, porque la misma nos exige que determinemos cuáles son los "daños físicos o a la propiedad cubiertos". Para llegar a esta determinación, debemos tomar en consideración las exclusiones, la designación de facilidades y la descripción de riesgos contenidas en la póliza. Igualmente importante es la consideración de ciertos elementos extrínsecos como la intención de las partes y la prima fijada, todo a la luz de las prácticas y costumbres prevalecientes en la industria del seguro.[2]

En <u>Meléndez Piñero</u>, id., la póliza que tuvimos ante nuestra consideración era una SCRG igual a la de este caso y nos enfrentamos a un ejercicio de interpretación similar al de ahora. En aquella ocasión la controversia ante nos era si el lenguaje de una de las cláusulas de exclusión de responsabilidad excluía de la cubierta los hechos por los cuales se le reclamaba a la aseguradora. Al resolver, establecimos las siguientes normas que habrían de regir la interpretación de este tipo de póliza. En primer lugar, al interpretarse una cláusula obscura para determinar si la misma excluye de la cubierta de la póliza los hechos por los cuales se le reclama a la aseguradora, toda duda será resuelta a

---

[2] Las prácticas prevalecientes y las costumbres que rigen en la industria del seguro sirven para suplir las omisiones en el contrato que estamos analizando. Así lo dispone el artículo 1239 del Código Civil, 31 L.P.R.A. sec. 3477, el cual reza: "El uso o la costumbre del país se tendrá en cuenta para interpretar las ambigüedades de los contratos, supliendo en éstos la omisión de cláusulas que de ordinario suelen establecerse."

favor del asegurado en cumplimiento con el criterio hermenéutico "contra preferentem" contenido en el artículo 1240 del Código Civil, 31 L.P.R.A. § 3478.[3]   En segundo lugar, la interpretación de estas pólizas tiene que ser cónsona con la norma que impone el Código de Seguros y que obliga a interpretar estos contratos "globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza...".   Art. 11.250, 26 L.P.R.A. § 1125.

En el día de hoy reiteramos ambas normas, pero aclaramos que su aplicación no es absoluta porque dependerá del tipo de controversia ante el tribunal.   Cuando sea necesario interpretar una cláusula en particular para determinar lo que quiso incluirse o excluirse con ella, aplicaremos las normas expuestas en Meléndez Piñero, supra.   Sin embargo, cuando sea necesario examinar la póliza completa para determinar el alcance de su cubierta, no podemos estar atados a un análisis que nos limita a una evaluación del lenguaje empleado.   En estos casos tendremos que tomar en cuenta ciertos elementos extrínsecos que puedan arrojar luz respecto a la intención de las partes.   Estos elementos pueden variar según las circunstancias del caso particular, pero generalmente serán la intención de las partes al contratar, la prima pactada, las circunstancias concurrentes con la negociación y contratación y las prácticas y costumbres establecidas por la industria de seguros.   Así lo reconocieron los peritos en este caso y así lo ha establecido nuestra jurisprudencia.

Aunque no lo hicimos en el contexto de una cubierta SCRG, en Autoridad de Acueductos y Alcantarillados v. Librotex, Inc., opinión del 4 de abril de 1997, 97 JTS 41, reconocimos la necesidad de considerar elementos extrínsecos a una póliza para determinar la extensión de su cubierta.   A tales efectos, hicimos las siguientes expresiones:

> **"La interpretación** de los contratos y demás actos jurídicos, aunque haya de partir de la expresión contenida en las palabras pronunciadas o escritas, **no puede detenerse en el sentido riguroso o gramatical de las mismas, y ha de indagar fundamentalmente la**

---

[3]   A saber: "La interpretación de las cláusulas obscuras de un contrato no deberán favorecer a la parte que hubiese ocasionado la obscuridad." Esta norma no aplica cuando la cláusula que se está interpretando no es ambigua.

**intención de las partes y el espíritu y finalidad que hayan precedido al negocio**, infiriéndose de las circunstancias concurrentes y de la total conducta de los interesados como así viene a sancionarlo el Art. 1.2828 [1234 P.R.]..." Id. a la pág. 826, citando de F. Bonet Ramón, Código Civil Comentado, 2da. ed., pág. 1009. (Enfasis suplido)

Dijimos también que:

"Aunque ciertamente el lenguaje es esencial, **la prima también es un factor determinante al momento de examinar la expectativa de los contratantes**, ya que por lo general, la misma es proporcional al riesgo que asume la aseguradora." Id. a la pág. 829. (Enfasis suplido)

En resumen, el alcance de la cubierta de una póliza de SCRG siempre estará sujeto a interpretarse a la luz del lenguaje utilizado en la póliza y de la intención y propósito de los contratantes, aplicando el Código Civil como fuente de derecho supletorio. También serán un factor importante las prácticas y costumbres prevalecientes en la industria del seguro.

IV

Luego de examinar la resolución emitida por el tribunal de instancia y los alegatos que presentaron cada una de las partes en este pleito a la luz de la evidencia presentada, tenemos que concluir que la cubierta de responsabilidad pública de la póliza SMP 561545 no se extiende a los daños que se están reclamando en este caso. Nuestra decisión tiene varios fundamentos que discutimos individualmente a continuación.

Según los testimonios periciales ofrecidos, en la industria del seguro no se acostumbra utilizar el formato de pólizas SMP ni de cubiertas SCRG al expedir pólizas para cubrir la responsabilidad pública generada por una marina. Por lo general estas pólizas se expiden utilizando un formulario especialmente diseñado y luego de hacer un análisis de los riesgos de la marina que será asegurada.

La fijación de la prima para estas cubiertas también sigue un procedimiento especial. Al fijar el precio de la póliza, la práctica prevaleciente es que la parte interesada solicite la póliza por medio de un formulario en el que detalla las operaciones que desea incluir en la cubierta. Luego de recibir esta solicitud, la compañía aseguradora hace

un análisis de los riesgos previsibles y establece una prima que refleje estos riesgos adecuadamente. Si el solicitante está de acuerdo con la prima fijada, entonces se procede a la contratación.

En el caso de autos la póliza fue expedida siguiendo el formato de pólizas de tipo SMP con cubiertas SCRG y sin que se hiciera un análisis de los riesgos relacionados con las operaciones marítimas antes de que fuera expedida. Esto de por sí es un indicador bastante fuerte de que la cubierta no se extiende a las operaciones marítimas del Club, ya que se aleja de las prácticas prevalecientes en la industria. Pero este indicador cobra aun más fuerza cuando evaluamos las demás circunstancias en que fue expedida la póliza y las razones por las cuales no se hizo el análisis correspondiente.

La prueba demostró que la póliza SMP 561545 fue expedida por Albany a solicitud del señor Miguel Marqués, miembro fundador del Club y agente por dieciséis (16) años de la agencia de seguros Alvaro Calderón, Inc., quien estaba actuando en cumplimiento de una petición que le hicieran los oficiales del Club. La prueba también demostró que antes de que se expidiera la póliza que está en controversia, los oficiales del Club nunca solicitaron una cotización de la prima a base de un análisis de riesgos relacionados con la operación de su marina.

En cuanto a este punto, el tribunal de instancia determinó que Albany había intentado probar que el Sr. Marqués le había ofrecido la cubierta marítima al Club, pero concluyó que "dicha teoría fue desvirtuada por el testimonio de dichos testigos [oficiales del Club], ya que el Dr. Grau Gaztambide testificó que no recordaba dicha oferta y el Sr. Ramón Rodríguez declaró que luego del accidente fue informado por el Sr. Marqués que había otra póliza de marina que cubría estos riesgos." **Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho, y Resolución, a la pág. 29.** Esta determinación del tribunal no puede ser sostenida.

Si bien es norma trillada que en ausencia de error manifiesto, pasión, prejuicio o parcialidad no intervendremos a nivel apelativo con

las determinaciones de hecho y adjudicación de credibilidad hechas en instancia, Quiñones López v. Manzano Pozas, 96 JTS 95, del 25 de junio de 1996; Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Ramos Acosta v. Caparra Dairy, Inc., 113 D.P.R. 357 (1982), en este caso no podemos sostener la determinación a la que llegó el tribunal porque entendemos que la prueba ofrecida por Albany no fue controvertida por la prueba ofrecida por el Club.

La evidencia de Albany para probar que había ofrecido la cubierta marítima y que el Club la rechazó consistió en el testimonio del Sr. Marqués. Este declaró sin ambigüedad alguna que en varias ocasiones se reunió con los oficiales del Club para expresarles la necesidad de que obtuvieran una cubierta especial para la marina y que en dos ocasiones les entregó la solicitud de esta cubierta, pero que los oficiales rechazaron su oferta por entender que el costo era demasiado alto.

Para tratar de controvertir el testimonio del Sr. Marqués, la evidencia de las demás partes se limitó a la declaración de los dos oficiales del Club antes mencionados. El Dr. Grau Gaztamibe expresó que no recordaba si se le había entregado la solicitud para el análisis de riesgos necesario antes de la expedición de la cubierta marítima, **pero que tampoco recordaba que no se le hubiese entregado**. El Sr. Ramón Rodríguez simplemente declaró que a él se le habló de la cubierta marítima después del accidente cuando se le informó que la cubierta adquirida no incluía los daños reclamados. Estas declaraciones, por resultar crasamente ambiguas, no pueden ser consideradas suficientes para controvertir el testimonio detallado del Sr. Marqués. En vista de ello, nos enfrentamos a un error manifiesto del tribunal de instancia que justifica por sí solo que alteremos su determinación respecto a estos hechos. Por tanto, al aceptar como hechos probados que al Club se le ofreció la cubierta marítima y que se le informó que tenía que solicitar un análisis de los riesgos de su marina pero decidió no solicitarlo, tenemos que concluir que sabía que no estaba adquiriendo una póliza de

responsabilidad pública que incluyera los riesgos relacionados con la operación de su marina.

Ahora bien, aun prescindiendo de la práctica aceptada en la industria de seguros de hacer un análisis de los riesgos antes de fijar la prima de una cubierta que incluya los riesgos de una marina, no podemos concluir que Albany expidió la póliza SMP 561545 con intenciones de cubrir estos riesgos, ya que el precio que cobró por ella se aleja drásticamente del precio que se acostumbra fijar por estas cubiertas. Nos explicamos.

Varios de los testigos periciales presentados por Albany declararon que la cubierta por responsabilidad pública que adquirió el Club tuvo un costo aproximado de $300.00 a $380.00 anuales. También declararon que una póliza para cubrir la responsabilidad pública que pueden generar operaciones marítimas como las del Club suele costar entre $4,500.00 y $7,000.00 anuales, dependiendo de los riesgos envueltos. Estos testimonios no fueron controvertidos por las demás partes, por lo que procede que aceptemos como probados los hechos evidenciados por tales testigos. Dada la diferencia tan marcada entre el precio de la cubierta adquirida y el precio que suele pagarse por una cubierta de responsabilidad pública para cubrir operaciones marítimas, tenemos que concluir una vez más que las partes tenían que estar conscientes en todo momento de que la póliza expedida no cubría las operaciones marítimas del Club.[4]

Finalmente, tenemos que examinar el texto que fue utilizado para describir el tipo de póliza que se estaba expidiendo. Con esto nos referimos a la descripción de riesgos cubiertos por la SCRG y a la designación de facilidades cubiertas por el seguro de propiedad.

El Exhíbit I presentado ante el tribunal de instancia por todas las partes en este pleito fue la póliza de seguro expedida por Albany. Esta consiste de una primera hoja que contiene declaraciones generales sobre

---

[4] Esta diferencia en los precios de las pólizas es otro factor por el cual merece mayor credibilidad el testimonio del Sr. Marqués que al testimonio del Dr. Gaztambide y del Sr. Rodríguez.

el asegurado y sobre las cubiertas incluidas en la póliza, además de varias hojas adicionales en las que se establecen los parámetros de cada una de las cubiertas.

En cuanto a la cubierta SCRG, el formulario L 6394a establece los límites de responsabilidad y la descripción de los riesgos cubiertos por la póliza. Al hacerlo, emplea el siguiente vocabulario: "The following discloses all hazards insured hereunder..." y "The insurance afforded is only with respect to such of the following coverages." Luego, en la columna correspondiente a "description of hazards", utiliza la clasificación correspondiente al código 79472 del manual publicado por la "Insurance Service Office", el cual indica Club, country, golf, polo or tennis". En ningún lugar se utilizó una clasificación que incluyera actividades similares a las de una marina ni la clasificación que se provee para riesgos que no caen bajo ninguna de las otras categorías.[5]

Además de esta clasificación, la póliza también contiene un endoso en el que se designan las facilidades incluídas en la cubierta sobre la propiedad. Este lee: "Sobre edificio construido todo de concreto con una terraza construida de vigas de acero y techo de madera, abierta, localizado en el Bo. Vigía, Arecibo, P.R."; "Sobre contenido en general propio de un Club (sic), mientras se encuentre en el edificio arriba descrito." Véase Póliza, formulario MP 12 05 (Exhíbit I de todas las partes), Petición de Certiorari a la pág. 185.

Si bien es cierto que esta designación se refiere a la cubierta para la propiedad del Club contenida en la Sección I de la póliza, es éste el único lugar en el que se describe la propiedad sobre la cual ha de recaer el seguro. Por ello, sería irrazonable que concluyéramos que la cubierta

---

[5] Las declaraciones generales contenidas en la póliza establecen los límites de responsabilidad de la cubierta por responsabilidad pública haciendo referencia al formulario L 6395a. No obstante, debemos indicar que luego de examinar la póliza presentada como exhíbit, no hemos podido localizar este documento. Lo que sí tenemos es el formulario L 6394a, titulado "Comprehensive General Liability Insurance", que comienza indicando: "For attachment to Policy No. SMP 561545 to complete said policy." Entendemos que debe haberse cometido un error tipográfico, y que al hacer referencia al documento L 6395a, realmente estaban haciendo referencia al formulario L 6394a.

de responsabilidad pública va a recaer sobre unas facilidades que no se mencionan en ningún lugar y que, además, las operaciones que se ejecutan en estas facilidades no guardan relación lógica con la clasificación que se utilizó para designar los riesgos asegurados.[6]

Esto nos obliga a concluir que, aun limitándonos a leer el texto de la póliza sin tomar en cuenta la intención de las partes, la cubierta sólo estaba diseñada para asegurar los riesgos que pudieran surgir de actividades típicas de un club de tenis, de polo, de golf o de lo que se conoce como un "country club".  Sin entrar a definir qué actividades son estas, ciertamente podemos aseverar que no incluyen actividades en las que existe el riesgo de que se derrame gasolina en el piso de una lancha propiedad de uno de los miembros del club y, que a consecuencia de ello, la lancha se incendie, sufran daños tanto la lancha incendiada como otras lanchas cercanas y sufra graves quemaduras una persona que estaba dentro de la lancha incendiada.         V

Por los fundamentos antes expuestos, se dictará sentencia revocando la resolución dictada por el antiguo Tribunal Superior el día 13 de septiembre de 1991, desestimando en su lugar la demanda contra tercero presentada contra Albany Insurance Company por los señores Robert Stokes y Elena Abreu y ordenando la devolución del caso al Tribunal de Primera

---

[6] Por parecernos que los hechos que estuvieron presentes en el caso de _St. Paul Fire and Marine Insurance Company v. Coleman_, 204 F.Supp. 713 (D.C. Ark. 1962), ilustran gráficamente lo anterior, incluímos aquí un breve análisis del mismo.  En dicho caso se solicitó del tribunal federal del distrito de Arkansas que dictara sentencia declarando que la póliza en controversia no cubría una reclamación surgida de un accidente muy similar al de autos, en el que una lancha se incendió por un derrame de gasolina causado por la negligencia de los empleados de la marina asegurada.  A diferencia de la póliza expedida por Albany, el acuerdo de cubierta en ese caso definió los riesgos como "The ownership, maintenance or use of premises, **and all operations**"; y describió los riesgos como: "Boat Yards Public B **including sale of** boats, accessories, **gasoline** and oil, boat building and repair.  Code 2464.  Boat storage and moorage including ship or dock rental.  Code 3493.  Building or premises – mercantile or manufacturing, not occupied by the insured – NOC – (Lessor´s risk only).  Code 129". (Enfasis suplido.)

Tras un análisis del vocabulario utilizado en la póliza, el tribunal federal resolvió que era obvio que la intención de las partes en el caso ante su consideración había sido  incluir en la cubierta los accidentes cuyas causas surgieran en los muelles en que se dispensa gasolina y otras instalaciones de la marina.  Véase también Appleman, supra, § 4493.01.

Instancia para que continúe con los procedimientos en forma compatible con lo aquí resuelto.

José A. André García

Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Robert W. Stokes y Elena Abreu,
por sí y por su sociedad legal
de gananciales

    Demandantes-Recurridos


    v.                           Caso Núm. CE-91-762

Reynés Serrano Lecaroz, Néstor
Serrano Colón, María Josefa Lecaroz,   Sobre:
Club Náutico de Arecibo

                                   Certiorari

    Demandados-Recurridos

---------------------------------------

Néstor Serrano Colón y María Josefa
Lecaroz Guzmán, por sí y como padres
con patria potestad del menor Reynés
Serrano Lecaroz

    Demandantes-Recurridos

       v.

Robert Stokes y Elena Abreu, ambos
por sí y como miembros de la sociedad
legal de gananciales por ellos
constituida, la Corporación Concrete,
Club Náutico de Arecibo, Inc.

    Demandados-Recurridos

       v.

Jorge Marquez Gómez, en su carácter
de Administrador Interino del Fondo
del Seguro del Estado

    Interventor-Recurrido

       v.

Albany Insurance Co.

    Tercera Demandada-Recurrente

---------------------------------------

SENTENCIA


San Juan, Puerto Rico, a 24 de abril de 1998

       Por los fundamentos expuestos en la Opinión que
antecede, la cual se hace formar parte integrante de la presente, se
dicta sentencia revocando la resolución dictada por el antiguo Tribunal

Superior el día 13 de septiembre de 1991, mediante la cual se desestimó la demanda contra tercero presentada contra Albany Insurance company por los señores Robert Stokes y Elena Abreu, y en su lugar se ordena la devolución del caso al Tribunal de Primera Instancia para que continúe con los procedimientos en forma compatible con lo aquí resuelto.

Lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López concurre en el resultado sin opinión escrita. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita. El Juez Asociado señor Negrón García inhibido.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo