EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de Mayagüez<br><br>Recurrido<br><br>v.<br><br>Edgardo Lebrón h/n/c<br>Lebrón & Associates<br><br>Peticionario | Certiorari<br><br>2006 TSPR 70<br><br>167 DPR _____ |

Número del Caso: AC-2004-37

Fecha: 21 de abril de 2006

Tribunal de Apelaciones:

        Región Judicial de Mayagüez

Jueza Ponente:

        Hon. Yvonne Feliciano Acevedo


Abogados de la Parte Recurrida:

        Lcdo. Alberto Omar Jiménez Santiago
        Lcdo. Carlos Enrique Cardona Fernández

Abogada de la Parte Peticionaria

        Lcda. Rebeca Barnés Rosich



Materia: Suspensión de Arbitraje



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Mayagüez

    Recurrido

        v.

                          AC-2004-37

Edgardo Lebrón h/n/c
Lebrón & Associates

    Peticionario

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 21 de abril de 2006

Nos corresponde resolver si una disposición contractual sobre arbitraje es oponible a un municipio cuando ésta no formó parte del contrato de construcción entre el municipio y un particular, pero se incluyó en el documento de especificaciones conforme a las cuales, según el contrato, habría de realizarse la obra.

## I.

Los hechos de este caso surgieron a raíz de la remodelación del Palacio de Recreación y Deportes del Municipio de Mayagüez ("Municipio"). El 24 de enero de 1995, el Municipio contrató a la firma de

arquitectos Rigau & Penabad para que preparase los documentos relacionados con la remodelación. Ésta preparó, entre otras cosas, un *Documento de Especificaciones* ("Especificaciones"). En el mismo se incluyeron varios escritos modelos del American Institute of Architects (AIA), entre ellos uno titulado *General Conditions of the Contract for Construction, AIA Document A201-1976* ("Condiciones Generales" o "A201"). Apéndice de la *Apelación Civil* (Apéndice), págs. 54, 96-114.

El Municipio llevo a cabo el proceso de subasta para seleccionar al contratista de la remodelación, en dos ocasiones. En ambas ocasiones las subastas fueron declaradas desiertas. Antes de la segunda subasta, el Municipio informó a los interesados en el *Aviso de Subasta* que, "[t]oda información necesaria, así como todos los documentos de contratos y modelos de proposición, podrán obtenerse en el Departamento de Conservación, Ornato y Desarrollo Urbano . . . ." Apéndice, pág. 906. En la reunión pre-subasta celebrada para este proyecto se indicó que "el libro de especificaciones que se preparó para la primera subasta de este proyecto, **está completamente vigente** y no se ve alterado en forma alguna como consecuencia de las revisiones a que se sometió el diseño." (Énfasis nuestro.) Dicha aclaración consta en la correspondiente *Minuta*, cuyo contenido **"pasa a ser parte de las condiciones generales de las especificaciones técnicas del proyecto y, consecuentemente, de los documentos de subasta y construcción."** (Énfasis nuestro.) Apéndice,

págs. 910-911.

Sin embargo, como indicamos, ambas subastas se declararon desiertas duarante el año 1996,[1] pues hubo una sola licitación y ésta excedió los fondos disponibles. El peticionario, Edgardo Lebrón ("Lebrón"), fue el licitador único en ambas ocasiones. Por ende, el 15 de noviembre de 1996 el Municipio autorizó que se atendiera el asunto administrativamente, y luego entró en negociaciones con el peticionario. *Contrato de Construcción*, Apéndice, págs. 64-75; *Carta de 11 de marzo de 1996*, Apéndice, pág. 907; *Resolución Núm. 38, Serie 1996-1997*, Apéndice, pág. 930-933.

Las partes otorgaron el 30 de mayo de 1997 un *Contrato de Construcción*. Éste disponía en su primer artículo que el Municipio:

> "contrata los servicios del [peticionario], para que realize [sic] la Primera Fase de las obras de Remodelación del Palacio de Recreación y Deportes de Mayagüez, **conforme se describe en los planos y especificaciones sometidos por el Departamento de Conservación, Ornato y Desarrollo Urbano y aceptados por el Contratista . . . ."**[2] (Énfasis nuestro.)

Apéndice, pág. 64. No surge del referido contrato ninguna

---

[1] Específicamente, durante el año 1996 se notificó la cancelación de la primera subasta y se llevaron a cabo los procedimientos relacionados con la segunda subasta.

[2] Éste contrato cubrió sólo la primera de cuatro fases contempladas, sujetándose las demás a la aprobación de fondos. Eventualmente, las partes enmendaron el contrato de construcción, el 3 de agosto y 4 de diciembre de 1998, para incluir las fases segunda, tercera y cuarta. Ambas enmiendas establecieron que permanecerían vigentes las otras disposiciones del contrato original. Apéndice, págs. 4 y 64-75.

otra referencia al Documento de Especificaciones ni al arbitraje.

Así las cosas, el peticionario presentó un *Demand for Arbitration* ("Petición de Arbitraje") ante la American Arbitration Association el 2 de enero de 2002. Citó como fuente para el arbitraje el artículo 7.9 de las Condiciones Generales incluidas en el Documento de Especificaciones. No existe controversia con respecto a que dicho documento fue el que se utilizó durante el proceso de subastas y que Lebrón obtuvo su copia del Departamento de Conservación, Ornato y Desarrollo Urbano del Municipio.

Ante la Petición de Arbitraje de Lebrón, el Municipio acudió al Tribunal de Primera Instancia con una demanda de *Petición de Suspensión de Arbitraje y Solicitud de Vista Inmediata* el 18 de marzo de 2002. Alegó que no existía entre las partes un convenio de arbitraje. Apéndice, págs. 60-63.[3]

El Tribunal de Primera Instancia declaró con lugar la demanda del Municipio, al concluir que no existía entre las partes una obligación contractual de someterse al arbitraje.[4] Insatisfecho, el peticionario acudió al

---

[3] El Municipio apoyó su alegación al señalar, en síntesis, que el Contrato de Construcción no contiene ni hace referencia a una cláusula de arbitraje, que las partes nunca discutieron tal cláusula, y que las Condiciones Generales se incluyeron en el Documento de Especificaciones sin la autorización de un funcionario o particular con la facultad de vincular al Municipio al arbitraje. *Id*.

[4] Las determinaciones de hechos aquí pertinentes del juzgador, cuya veracidad no cuestionamos, fueron las siguientes: (1) el contrato de construcción no contiene una

Tribunal de Apelaciones, cuya *Sentencia* confirmó la del foro primario.[5] Apéndice, págs. 53-59 y 2-9. Luego acudió ante nosotros mediante recurso de apelación, escrito que acogimos como una petición de *certiorari* y expedimos el auto solicitado.[6] Dada la comparecencia de ambas partes, y

---

cláusula de arbitraje; (2) el plano y todo lo concerniente a las especificaciones los preparó Rigau & Penabad, entidad que carecía la facultad de obligar al Municipio al arbitraje; (3) el arquitecto Iván Rigau fue quien incluyó las Condiciones Generales en el Documento de Especificaciones; (4) según el testimonio del peticionario, Lebrón, el arbitraje nunca se discutió con el Municipio, y no surge de la prueba que las partes hayan negociado sobre ello; (5) el Documento de Especificaciones no estuvo ante las partes cuando se firmó el Contrato de Construcción; (6) el arquitecto Rigau no informó al Municipio sobre la cláusula de arbitraje; (7) el Documento de Especificaciones estaba en posesión del Departamento de Conservación, Ornato y Desarrollo Urbano del Municipio; (8) el costo de las cuatro fases sería $1,100,000.00, $918,265.00, $37,607.00, y $454,264.00. Al examinar estos hechos a la luz del derecho aplicable, el Tribunal de Primera Instancia concluyó que no hubo entre las partes un pacto de arbitraje. Destacó que las partes no discutieron ni negociaron sobre el asunto. Apéndice, págs. 54-55 y 58.

[5] El Tribunal de Apelaciones prestó deferencia a la apreciación de la prueba que hizo el foro de instancia. Señaló, *inter alia*, que las partes no discutieron el arbitraje y que Rigau & Penabad incluyó las Condiciones Generales en el Documento de Especificaciones sin la autorización del Municipio. Apéndice, págs. 8-9.

[6] El peticionario señaló cuatro errores:

    (1) Erró el Honorable TA al requerir, como condición para la obligatoriedad de una disposición contractual, que ésta sea aprobada o autorizada por el asesor legal del municipio.

    (2) Erró el Honorable TA al requerir, como condición para la obligatoriedad de la cláusula de arbitraje, que ésta fuera negociada y discutida expresamente entre las partes.

    (3) Erró el Honorable TA al avalar la determinación del TPI a los efectos de que el contrato de construcción no tiene en su

hallándonos en posición de resolver, procedemos a hacerlo.

## II.

Nuestro derecho de obligaciones y contratos gubernamentales parte de una premisa sencilla: las entidades gubernamentales están sujetas a las mismas normas que las demás personas y entidades. Véase, *e.g.*: *Campos Ledesma v. Compañía de Fomento Industrial*, 153 D.P.R. 137, 149 (2001); *Municipio de Ponce v. Gobernador*, 136 D.P.R. 776, 787 (1994); *Plan de Bienestar de Salud v. Alcalde de Cabo Rojo*, 114 D.P.R. 697, 699 (1983); *Zequeira v. C.R.U.V.*, 83 D.P.R. 878, 880-881 (1961); *Rodríguez v. Municipio*, 75 D.P.R. 479, 494 (1953). Evidentemente, esta norma admite múltiples excepciones, entre ellas que todo contrato con un municipio debe ser escrito. Véase *Lugo Ortiz v. Municipio de Guayama*, 162 D.P.R. ___, res. 29 de octubre, 2004 T.S.P.R. 166. Mas no existen disposiciones jurídicas vigentes que impongan requisitos u otras normas especiales al pacto de arbitraje entre un municipio y un particular. Por ende, debemos examinar el derecho general con respecto a los acuerdos de arbitraje.

---

texto, ni por referencia una cláusula de arbitraje.

(4) Erró el Honorable TA al entender que el Municipio de Mayagüez no está obligado por todas las disposiciones contenidas en el Pliego de Especificaciones que ese mismo municipio ordenó confeccionar y, posteriormente entregó a todos los licitadores de la subasta para que rigieran el proceso de subasta, contratación y ejecución de la obra subastada.

### III.

### A.

Generalmente, nuestro ordenamiento permite que las partes en un contrato se obliguen al arbitraje de las posibles controversias futuras relacionadas con su contrato. Dicha facultad surge principalmente de la Ley de Arbitraje Comercial ("Ley de Arbitraje"), la cual establece que las partes "podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo." Tales convenios, se dispone, serán válidos, exigibles e irrevocables "salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio." Ley Núm. 376 de 8 de mayo de 1951, 32 L.P.R.A. § 3201. De modo que estamos ante una figura de naturaleza contractual. *Rivera v. Samaritano & Co.*, 108 D.P.R. 604, 606-607 (1979); *U.C.P.R. v. Triangle Engineering Corp.*, 136 D.P.R. 133, 144 (1994).

El arbitrage convencional, naturalmente, es exigible sólo cuando se ha pactado, y el precepto citado de la Ley de Arbitraje aclara que dicho pacto debe ser escrito. *Municipio de Ponce v. Gobernador*, *supra*, a la pág. 783 (1994); *Crufon Construction Corp. v. Autoridad de Edificios Públicos*, 156 D.P.R. ___, res. 11 de febrero, 2002 T.S.P.R. 16. Si existe controversia con respecto a la obligación de arbitrar, las partes tienen derecho a que se dirima en los tribunales. Artículo 4, Ley de Arbitraje, 32 L.P.R.A §

3204. Hemos señalado que tal controversia admite tres modalidades. Puede referirse a si existe un convenio de arbitraje, si tal convenio alcanza determinada controversia, y si tal convenio alcanza una disputa sobre la duración o expiración del contrato. *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, a la pág. 144 (1994); *World Films v. Paramount Pictures Corp.*, 125 D.P.R. 352, 361 nota 9 (1990); ambos citando a *National R.R. Passenger Corp. v. Boston S. Maine Corp.*, 850 F.2d 756 (Cir. D.C. 1988).

Ahora bien, como existe una fuerte política pública favorable al arbitrage, toda duda con respecto a si procede el mismo debe resolverse en la afirmativa. *Paine Webber v. Soc. de Gananciales*, 151 D.P.R. 307, 312-313 (2000); *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, a las págs. 141-142 y 143; *World Films v. Paramount Pictures Corp.*, *supra*, a las págs. 361-362 (1990); *McGregor-Doniger v. Tribunal Superior*, 98 D.P.R. 864 (1970). Incluso, hemos señalado que "ante un convenio de arbitraje lo prudencial es la abstención judicial, aunque esa intervención no esté vedada." *U.C.P.R. v. Triangle Engineering Corp.*, *supra*, a la pág. 142. También hemos observado que bajo la Ley Federal de Arbitraje, 9 U.S.C.A. § 1 *et seq.*,[7] cuando existe un convenio válido y exigible de arbitraje, los tribunales carecen de discreción con respecto a su eficacia. *Paine*

---

[7] La Ley Federal de Arbitraje aplica a los contratos en el comercio interestatal. *Paine Webber v. Soc. de Gananciales*, supra, a la pág. 311.

*Webber v. Soc. de Gananciales*, *supra*, a las págs. 311-312.

**B.**

En el ámbito de los contratos de construcción comercial, las cláusulas de arbitraje no precisan un consentimiento específico, sino que pueden incorporarse mediante referencia en el contrato principal. Se ha entendido así en la mayoría de las jurisdicciones estadounidenses, a cuya jurisprudencia acudimos por ser nuestra Ley de Arbitraje una criatura del derecho norteamericano. Véase, *e.g.*: *T. R. Mills Contractors v. WRH Enterprises*, 93 S.W.3d 861, 870-871 (Tenn. Ct. App. 2002); *Liberty Management & Construction v. Fifth Ave. & Sixty-Sixth St. Corp.*, 208 A.D.2d 73 (N.Y. Sup. Ct. App. Div. 1995); *ADC Construction Co. v. McDaniel Grading*, 338 S.E.2d 733 (Ga. App. 1985). Incluso, la casuística de algunas jurisdicciones sugiere que la incorporación no exige palabras sacramentales ni la firma del documento incorporador, aún cuando el arbitraje precisa un acuerdo escrito.[8]

El caso de *Liberty Management & Construction v. Fifth Ave. & Sixty-Sixth St. Corp.*, *supra*, ilustra la norma aludida. En su propuesta de subasta, un contratista

---

[8] La jurisprudencia discutida a continuación se resume útilmente en: W. J. Dunn, *Contract providing that it is governed by or subject to rules or regulations of a particular trade, business, or association as incorporating agreement to arbitrate*, 41 A.L.R. 2d 872; R. J. Sutton, *Enforcement of Arbitration Agreement Contained in Construction Contract by or Against Nonsignatory*, 100 A.L.R. 5th 481.

expresó que había examinado y entendía los planos, especificaciones e instrucciones relacionados con un proyecto de remodelación. También expresó su voluntad **de realizar el trabajo en estricta conformidad con los documentos contractuales**. Estos incluían un modelo contractual del AIA que incorporaba, a su vez, las Condiciones Generales de dicha entidad. El dueño de la obra aceptó una version revisada de la propuesta, mediante una carta cursada el 18 de noviembre de 1991. Aunque el contratista no firmó los documentos del AIA, se alegó que los había aceptado mediante otra carta, cursada el 20 de diciembre de 1991. Resolvió el tribunal que era oponible al contratista la cláusula de arbitraje contenida en las Condiciones Generales:

> Thus, **under either version of the agreement**, plaintiff's -- the agreement allegedly completed by appellant's December 16, 1991 letter accepting plaintiff's November 18, 1991 proposal, as subsequently revised -- or appellant's -- the December 20, 1991 AIA contract, which plaintiff allegedly accepted by its January 2, 1992 letter -- plaintiff agreed to arbitrate.

*Liberty Management & Construction,* supra, a la pág. 78.[9] En otras industrias se ha aplicado un criterio similar.[10] Y a

---

[9] También véase: *T. R. Mills Contractors v. WRH Enterprises,* supra; *Landmark Properties, Inc. v. Architects International-Chicago,* 526 N.E.2d 603 (Ill. App. 1988); *Todd Habermann Construction, Inc. v. Epstein,* 70 F. Supp.2d 1170 (D. Colo. 1999); *Frank J. Rodney, Inc. v. Charles W. Ackerman of Fla., Inc.,* 219 So.2d 110 (Fl. Dist Ct. App. 1969), *cert.* desestimado, 230 So.2d 13.

[10] Véase, por ejemplo, *Wilson & Co. v. Fremont Cake & Meal Co.,* 77 F. Supp. 364 (D. Neb. 1948).

pesar de que algunos tribunales han sido menos flexibles,[11] la jurisprudencia citada es de gran valor persuasivo, dada nuestra política pública favorable al arbitraje.

## IV.

El norte de la interpretación contractual es determinar cuál fue la real y común intención de las partes. *Merle v. West Bend Co.*, 97 D.P.R. 403, 409-410 (1969); *Carrillo Norat v. Camejo*, 107 D.P.P. 132, 138 (1978); *Marcial Burgos v. Tome*, 144 D.P.R. 522, 537 (1997); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842, 852-853 (1991); *Ramírez, Segal & Látimar v. Rojo Rigual*, 123 D.P.R. 161, 173-174 (1989). Dicho análisis comienza y termina con los términos del contrato, siempre que éstos sean claros y no dejen duda sobre la susodicha intención. Artículo 1233 del Código Civil, 31 L.P.R.A. § 3471; *Trinidad v. Chade*, 153 D.P.R. 280, 289 (2001); *Marcial Burgos v. Tome*, *supra*, a la pág. 536; *Mattei Nazario v. Vélez & Asociados*, 145 D.P.R. 508, 517 (1998); *Unysis v. Ramallo Brothers*, *supra*, a la

---

[11] *In Re General Silk Importing Co.*, 189 N.Y.S. 391 (Supreme Ct. App. Div. 1921); *In Re General Silk Importing Co.*, 194 N.Y.S. 15 (Supreme Ct. App. Div. 1922), confirmado, 234 N.Y. 513; *Re Bachmann, E. & Co.*, 197 N.Y.S. 879 (Supreme Ct. App. Div. 1923); *Riverdale Fabrics Corp. v. Tillinghast-Stiles Co.*, 306 N.Y. 288 (1954). Cf. *Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82 (1953);, 121 N.Y.S.2d 261. Obsérvese que a veces se niega el arbitraje en el contexto de circunstancias especiales. Véase, *e.g.*: *Harper v. Ultimo*, 113 Cal. App. 4th 1402 (Ct. App. 2003); *Western Vegetable Oils Co. v. Southern Cotton Oil Co.*, 141 F.2d 235 (9no Cir. 1944); *Pillsbury v. Blumenthal*, 272 P.2d 326 (N.M. 1954); *Northridge Cooperative Section No. 1 v. 32nd Avenue Construction Corp.*, 139 N.Y.S.2d 37 (Supreme Ct. 1955); *American Rail & Steel Co. v. India Supply Mission*, 308 N.Y. 577 (1955).

pág. 852. Así, hemos indicado que "la tendencia de los tribunales es a limitar la interpretación a los casos en que se haga verdaderamente necesaria", reconociendo, no obstante, que "[i]nterpretar si un contrato es claro presupone concordar su letra con la intención de las partes." *Marcial Burgos v. Tome*, *supra*, a la pág. 537; véase también, *e.g.*, *Merle v. West Bend Co.*, *supra*, a las págs 410-411.

Para determinar la verdadera y común intención de las partes, acudimos a una serie de normas interpretativas. Por un lado, es preciso examinar la evidencia extrínseca al contrato. Dicha evidencia ha de referirse, principalmente, a los actos de las partes coetáneos y posteriores al contrato. Artículo 1234 del Código Civil, 31 L.P.R.A. § 3472. Ello no impide, sin embargo, que se examinen todas las circunstancias indicativas de la intención contractual, incluyendo la ocasión, circunstancias, personas y el acuerdo que se intentó llevar a cabo, así como los actos ocurridos durante la preparación del contrato. *Unysis v. Ramallo Brothers*, *supra*, a la pág. 853; *Ramírez, Segal & Látimer v. Rojo Rigual*, *supra*, a la pág. 174; *Merle v. West Bend Co.*, *supra*, a la pág. 410; *Cooperativa la Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978).

Por otro lado, varios principios encausan la interpretación de las palabras que se utilizaron para dar expresión al contrato. Son relevantes al caso de autos los artículos 1239 y 1240 del Código Civil, 31 L.P.R.A. §§ 3477 y 3478. El primero establece que debemos utilizar el uso y

la costumbre del lugar o industria pertinentes al contrato para aclarar lo pactado y para suplir lo no pactado. *G. H. Hammond Co. v. Diego Agueros & Co.*, 30 D.P.R. 610 (1922); *Soc. de Gananciales v. Serrano*, 145 D.P.R. 394, 399 nota 2 (1998); J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Madrid, Bosch, 1988, T. II, Vol. 1, pág. 237. Por otro lado, el artículo 1340 establece que la ambigüedad de un contrato o de sus cláusulas debe resolverse en contra de quien la provocó, aún cuando no se trata de un contrato de adhesión. Véase, *e.g.*: *Cooperativa la Sagrada Familia v. Castillo*, *supra*, a la pág. 418; *Zequeira v. C.R.U.V.*, 83 D.P.R. 878, 880 (1961).

Cabe añadir que el principio de lealtad incide sobre la interpretación de los contratos. Es decir, cuando resulta necesario determinar cuál fue la común voluntad de los contratantes, se entiende que éstos quisieron expresarse como lo hubiera hecho una persona de buena fe. En *Ex parte Negrón Rivera y Bonilla*, 120 D.P.R. 61 (1987), citamos la explicación que ofrece Díez-Picazo de esta norma:

> [Los contratos] deben interpretarse de acuerdo con la buena fe...[que es] un [estándar] de conducta arreglada a los imperativos éticos exigibles de acuerdo con la conciencia social imperante.... Los contratos han de ser interpretados presuponiendo una lealtad y una corrección en su misma elaboración, es decir, entendiendo que las partes al redactarlos quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades.... El contrato debe ser interpretado de manera que el sentido que se le atribuya sea el más conforme para llegar a un desenvolvimiento leal de las relaciones contractuales y para llegar a las

> consecuencias contratuales exigidas conforme a las normas éticas. La buena fe impone también la aplicación de las ideas de confianza y autorresponsabilidad en la interpretación.... Las declaraciones de voluntad deben interpretarse en el sentido más conforme con la confianza que hayan podido suscitar de acuerdo con la buena fe.

120 D.P.R., a la pág. 75; citando *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, Cap. XI, § 45, págs. 251-252. Véase, también: *Ramírez, Segal & Látimer v. Rojo Rigual*, *supra*, a las págs. 174-175; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 6ta ed., Madrid, Tecnos, 1989, Vol. II, págs. 86-87. Cabe añadir que el principio de lealtad en la redacción contractual incluye un deber de diligencia, toda vez que se presume "una **corrección** en su misma elaboración" y una expresión "según **el modo normal** propio de gentes honestas."

Finalmente, la controversia de marras exige una aclaración con respecto al vínculo entre la interpretación contractual y las normas hermenéuticas reseñadas. Hemos reiterado que el norte de tal interpretación es la verdadera y común intención de las partes. Sin embargo, las normas hermenéuticas que establece el Código Civil en sus artículos 1233-1241, 31 L.P.R.A. §§ 3471-3479, "son auténticas normas jurídicas, no máximas de experiencia, y como tales obligan al intérprete (jueces, árbitros)." Díez-Picazo y Gullón, *op. cit.*, pág. 88 (refiriéndose a los artículos 1.281-1.289 del Código Civil español).

Lo anterior significa, cuando menos, que si las normas interpretativas favorecen clara y consistentemente una interpretación sobre otra, debe prevalecer la primera. Por

ejemplo, la versión que surge claramente de los actos y circunstancias pertinentes debe prevalecer sobre la que surge del testimonio de un contratante con respecto a su propia intención; y la interpretación derivada del principio de lealtad ha de vencer una con mayor apoyo en la evidencia pero claramente contraria al mismo. Si bien la hermenéutica contractual tiene su norte en la verdadera y común intención de las partes, los cánones interpretativos son el imprescindible compás judicial.

## V.

Hemos visto que los convenios de arbitraje con un municipio están sujetos al derecho general de obligaciones y que un acuerdo de arbitraje es susceptible de incorporación por referencia en un contrato escrito. El caso de autos no presenta controversia alguna con respecto a la validez y eficacia del Contrato de Construcción entre el Municipio y Lebrón. Por ende, la única pregunta a dirimir es si dicho Contrato incorporó, mediante referencia, el artículo sobre arbitraje de las Condiciones Generales.

Delimitada así la pregunta, se observa que la única disposición pertinente del Contrato establece que el Municipio contrata a Lebrón para que realice la remodelación "conforme se describe en los planos y especificaciones sometidos por el Departamento . . . ." Resolvemos que, en las circunstancias de este caso, dicha cláusula basta para incorporar el documento A201 y su artículo 7.9 sobre arbitraje. Veamos.

**A.**

El alcance de la disposición citada admite más de una interpretación. Por un lado, podría significar que las obras de remodelación habrían de realizarse según los planos y las especificaciones --es decir, según las disposiciones técnicas allí contenidas. Esta interpretación tiene el efecto de excluir toda referencia a las disposiciones no técnicas del Documento de Especificaciones, el cual contiene las Condiciones Generales.

Por otro lado, la disposición citada podría significar que el Municipio "contrata los servicios del [peticionario] . . . conforme se describe en los planos y especificaciones sometidos por el Departamento" --es decir, que la frase "conforme se describe en los planos y especificaciones" modifica, no la descripción del trabajo, sino la descripción del contrato. Así interpretada, la cláusula hace referencia a todo el contenido del Documento de Especificaciones, incluso el documento A201 y su artículo 7.9 sobre arbitraje.

Ante estas dos posibles interpretaciones, debemos concluir que estamos ante una ambigüedad jurídica. Se recordará que la ambigüedad de un contrato no responde exclusivamente a sus palabras, sino que venimos obligados a "concordar su letra con la intención de las partes", máxime cuando existe una fuerte política pública en pro del arbitraje. Para ello acudimos al texto contractual y a la evidencia extrínseca, no sólo aquella relacionada con los

actos de las partes coetáneos y posteriores al contrato, sino también la que se refiere a los actos en preparación del contrato y a la ocasión, circunstancias, personas y acuerdo que se intentó llevar a cabo.

Los hechos de este caso revelan una ambigüedad en la intención de las partes con respecto a la incorporación del Documento de Especificaciones. Durante los procesos de subasta, el Municipio indicó que dicho documento sería parte del contrato. Lebrón participó en estos procesos y recibió las Especificaciones del Municipio. A pesar de que ambas subastas se declararon desiertas, las partes otorgaron el Contrato de Construcción unos meses después, mas sin antes discutir la cuestión del arbitraje. Dicho Contrato hizo referencia al Documento de Especificaciones, referencia que no se limitó, expresamente, a los aspectos técnicos del Documento. Estas actuaciones revelan una ambigüedad con respecto a sí ambas partes quisieron incorporar todo el contenido de las Especificaciones.

De otra parte, la jurisprudencia estadounidense examinada sugiere que el documento A201 del AIA es común en la industria de diseño y construcción de dicho país. Luego veremos que el Tribunal de Primera Instancia hizo una apreciación análoga con respecto a la industria local. Las partes no son ajenas a dichas industrias, y el Municipio contó con la asistencia de su División Legal. Además, el documento A201 advierte conspicuamente en su primera página: "this document has important legal consequences; consultation with an attorney is encouraged with respect to

its modification". Apéndice, pág. 96.

Por lo tanto, confirman nuestra conclusión, como pasamos a discutir, la ocasión, circunstancias, personas y el acuerdo que se intentó llevar a cabo.

**B.**

Habida cuenta de que resulta ambigua la referencia contractual a "los planos y especificaciones sometidos por el Departamento", resolvemos que el Contrato de Construcción hace referencia a todas las disposiciones del Documento de Especificaciones, documento que incluye las Condiciones Generales y su artículo 7.9 sobre arbitraje.

Al menos cuatro consideraciones apoyan esta conclusión. En primer lugar, si existe alguna duda con respecto a la obligación de arbitrar, se debe reconocer dicha obligación. Segundo, la ambigüedad de un contrato o de sus cláusulas no debe favorecer a quien la provocó. Las partes estipularon en el *Informe sobre Conferencia Preliminar entre Abogados* que Lebrón & Associates no intervino en la redacción del Contrato de Construcción, y el Municipio admite que lo redactó un funcionario suyo, a saber, el asesor legal a cargo de la unidad de contratos. Apéndice, pág. 764; *Alegato del Municipio de Mayagüez*, págs. 4-5 y 12-13; *Exposición Narrativa Estipulada*, Apéndice, pág. 984-986. Por ende, la ambigüedad de la cláusula de incorporación no debe favorecer al Municipio.

En tercer lugar, el uso y la costumbre sirven para especificar y suplir la ambigua intención de los contratantes. En las conclusiones de derecho de su

*Sentencia*, el Tribunal de Primera Instancia expresó lo siguiente:

> No se manifiesta un convenio expreso ni oral; por el contrario, lo que surge es una inclusión de arbitraje conforme a **un procedimiento rutinario** al preparar los documentos de especificaciones requeridos por el contrato de diseño, planos y otros suscrito con la firma arquitectos Rigau & Penabad."

*Apéndice*, pág. 58 (énfasis suplido). Es decir, el foro sentenciador entiende que incluir el escrito A201 en un Documento de Especificaciones es algo rutinario en la industria local de diseño y construcción. Ello no significa que todo contrato de construcción se entendería pactado con el documento de uso rutinario. Pero cuando el contrato consta por escrito y hace referencia ambigua a un grupo de documentos, y éste contiene un escrito que a menudo se utiliza íntegramente en la industria pertinente, el uso y la costumbre favorecen la total incorporación contractual del escrito.

El principio de la buena fe conduce al mismo resultado. Al interpretar el Contrato de Construcción, suponemos "una lealtad y una corrección en su misma elaboración", lo cual significa que las partes "quisieron expresarse según el modo normal propio de gentes honestas y no buscando circunloquios, confusiones deliberadas u oscuridades . . . ." *Ex parte Negrón Rivera*, *supra*, pág. 75. Dado que el Municipio había incluido las Condiciones Generales en el Documento de Especificaciones, que el Contrato de Construcción hacía referencia a dicho documento, y que se trata de un negocio jurídico multi-

millonario, sólo una persona desleal hubiera tenido la intención de limitar su alcance sin expresarla tajantemente.

## C.

Los argumentos del Municipio no alteran el resultado que hemos alcanzado. Éste sostiene que no tuvo la intención de obligarse al arbitraje.[12] Su conclusión se ampara, principalmente, en dos hechos: primero, que el Contrato de Construcción se redactó con el propósito de incorporar sólo los aspectos técnicos del Documento de Especificaciones; segundo, que los funcionarios facultados para vincular al Municipio desconocían la existencia del artículo 7.9 sobre arbitraje, toda vez que las Condiciones Generales se colocaron en el Documento de Especificaciones sin su autorización y conocimiento. Es decir, admite el recurrido que otorgó un contrato multi-millonario sin examinar los documentos incorporados ni limitar cuidadosamente su incorporación.

La posición del Municipio con respecto a su intención al redactar el Contrato está basada en el testimonio del

---

[12] El recurrido esgrime otros argumentos que no merecen un análisis detenido, dados los hechos de este caso y el derecho aplicable. Sostiene el Municipio, por ejemplo, que validar la disposición sobre arbitraje sería "inconsciente" (entiéndase, leonino). Añade que el pacto de arbitraje es contrario al orden público porque, entre otras cosas, las Condiciones Generales no se enviaron al Contralor, el asesor legal del Municipio nunca aprobó la cláusula de arbitraje, los arquitectos no tenían autorización para incluir el documento A201 en las Especificaciones, y la American Arbitration Association es un foro costoso e inadecuado. *Alegato*, Apéndice, págs. 15-17 y 22-28.

funcionario que lo redactó. Éste declaró que su propósito era incorporar los aspectos técnicos de las Especificaciones, y que el Municipio tenía una política pública contraria a las cláusulas de arbitraje. *Exposición Narrativa Estipulada*, Apéndice, págs. 984-986; *Alegato* del recurrido, págs. 12-13. No está claro si el foro sentenciador confirió entera credibilidad a dicho testigo, pero la cuestión es académica. Cuando los cánones de hermenéutica contractual favorecen clara y consistentemente una interpretación sobre otra, debe prevalecer la primera. Dadas las circunstancias de este caso, el juzgador debió rechazar la posición del Municipio, aún cuando le mereciera entera credibilidad el testimonio del funcionario.

Añade el Municipio que los funcionarios facultados para vincularlo desconocían la existencia de la disposición sobre arbitraje. Ahora, el recurrido no niega que las Condiciones Generales formaron parte del Documento de Especificaciones durante las dos subastas y durante la negociación del Contrato de Construcción. Nuestra inspección de los autos revela que el documento A201 se halla sin dificultad y que el contenido básico de su artículo 7.9 resulta evidente tras una lectura superficial del escrito. Por ende, la posición del Municipio es --y sólo puede ser-- que los funcionarios pertinentes no examinaron el Documento de Especificaciones antes de otorgar un multi-millonario Contrato de Construcción.

Podríamos despachar este argumento con la famosa

consigna del Juez Asociado señor Serrano Geyls,[13] pero resulta innecesario. La negligencia de quien otorga un contrato no es óbice para que se interprete el mismo según la política pública en pro del arbitraje, el uso y la costumbre, la buena fe, y la norma desfavorable a quien provoca una ambigüedad. De hecho, el principio de lealtad en la redacción contractual incluye un deber de diligencia. Así, la admisión del Municipio con respecto a su falta de conocimiento confirma nuestra conclusión.

## VI.

En virtud de los fundamentos expuestos, se revoca la *Sentencia* recurrida y en consecuencia se desestima la demanda de epígrafe.

Se dictará sentencia de conformidad.

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[13] "Los jueces no debemos . . . ser tan inocentes como para creer declaraciones que nadie más creería." *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Mayagüez

    Recurrido

      v.

Edgardo Lebrón h/n/c             AC-2004-37
Lebrón & Associates

    Peticionario

SENTENCIA

San Juan, Puerto Rico, a 21 de abril de 2006

Por los fundamentos antes expuestos en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se revoca la Sentencia recurrida y en consecuencia se desestima la demanda de epígrafe.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri no intervino. El Juez Asociado señor Rivera Pérez no interviene.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo